MARY COAKLEY, Appellee, v. DAIRY CATTLE CONGRESS et al.,
Appellants.

No. 45092.

AUGUST 6, 1940.

REHEARING DENIED NOVEMBER 15, 1940.

Butterfield & Butterfield and McCoy & Beecher, for appellee.

Carl F. Jordan, Dean Peisen, and George D. Harris, for appellants.

SAGER, J.—On September 30, 1937, plaintiff, with four others, attended an exposition then in progress on the grounds of the corporate defendant which, for convenience, will be hereafter referred to as the "Congress." This was an annual event much like a county fair though much larger. It provided the usual exhibition and amusement features with concessions of various kinds, calculated to suit the varied tastes of the large number of people who were induced to attend. Plaintiff paid an admission fee. She thereby became entitled to the protection to which visitors to enterprises of this sort are entitled.

On the day of the accident plaintiff with her companions has passed through barn No. 1 which housed an exhibition of Belgian horses. They proceeded to the west entrance of barn No. 2, likewise devoted to the showing of this breed. Plaintiff's group seems to have been the only patrons in the barn at that time. The horses of defendant Reece were stabled on the right or south side of the barn. As they entered grooms were engaged in harnessing a pair of horses in adjacent stalls. One teammate was harnessed before the other and was led to the west entrance. The other, named Jerry, sensing the going of his teammate, backed up when his halter was removed. The groom at the moment stood at Jerry's head with the bridle on his arm expecting to slip it on when the halter came off. The movement of the horse was too sudden to make this possible and the animal trotted to the end of the barn where his mate stood. At this time a volunteer grabbed the horse around the neck. This, with the waving of arms and shouting of those

near the door, frightened the animal which turned and ran back in the direction plaintiff and party were proceeding. Before coming to the place where plaintiff was, Jerry entered a vacant stall. The tumult and the clatter of horses' hoofs frightened plaintiff and she sought to avoid injury. Just what took place is uncertain. She tells the happenings at the instant of her hurt in this way:

"The first I saw of the horse was when he was coming toward us. I tried to get out of the way. I couldn't say how far I traveled. I looked both ways to see whether there was a place I could step in and I couldn't see any empty stall and I was afraid to step beside the horses. I didn't run. I couldn't say I moved. I didn't turn around and fall in·my tracks. I just don't know whether I went forward some. I just can't explain it to you what a feeling it was. I couldn't say whether I went to the east or the west, but I looked for a place, and I suppose I must have looked around to see where I could step in. I suppose I fell and hurt myself; I was trying to get away."

A large part of the argument is devoted to the question whether the defendant corporation was liable for the acts of its co-defendant Reece either under the doctrine of res ipsa loquitur or on the theory that he was an independent contractor. In this connection is discussed the question as to how far a fair, exhibition, exposition or amusement enterprise is liable for the negligence of its exhibitors and concessionaires. Related to these contentions is appellee's insistence that the Congress, by retaining supervisory rights over its exhibitors, became liable for their negligence. We do not discuss these questions for the reason that for the purposes of this opinion, we assume that the Congress was liable for any carelessness on the part of its co-defendant. We regard the retention of the right to supervise exhibitors as of no importance because it went no further than is required by law of persons so engaged to see that the exposition to which it had invited the general public is kept reasonably safe.

■ Contributory negligence on the part of plaintiff is excluded and will have no attention. The inquiry then remains —what was the negligence of the defendants? The record is void of any showing of defect in the construction or arrangement of the barn in which plaintiff fell; neither the width nor depth of the stalls nor the character of the passageway between the stalls is shown to be improper. Its general condition is described in this way:

"The width of the aisle and the distance between stall-ends, and so forth, as compared to the International Livestock Show in Chicago, the Dairy Cattle Congress, the aisle-width is considerably greater; and I think it is about equal to the aisle-width at the National Dairy Show and at the other fairs that I have mentioned."

There was no defect in the floor and no obstruction or obstacle which caused plaintiff to fall. The corporate defendant met its obligation to provide a reasonably safe place for its visitors.

■ What then of the negligence of Reece or his servants? Jerry was seven years old and had been exhibited for three years at the Illinois State Fair, the Iowa State Fair, the fair at Marshalltown, and at the Congress. He was thus described by those who were familiar with and had handled him—"a gentle, docile animal."—"He is a very gentle horse, well-trained and never had any difficulty with him whatsoever in my [the groom's] experience." And this:

"Q. What was the nature of this horse? A. Well, I wouldn't want him much gentler."

What then was the nature of Jerry's offending or where the negligence of his keepers? There was nothing vicious, unruly or otherwise objectionable about the animal. He was accustomed to exhibition, and with his mate, Colonel, as a part of a six-horse hitch, had entertained crowds at fairs for several years. He was well broken and had been worked in the field.

On the morning of the accident one horse of the team, being harnessed, was led to the barn to await Jerry's coming. The groom with the bridle on his arm slipped off the halter and before the bridle could be placed, Jerry trotted down to join his mate at the west door for the morning's exercise. This was something he had never done before. Had volunteers not assumed to direct his movements or to stop his course, the groom could have followed him and in a moment put the bridle on. But the racket frightened the horse and he turned and ran into a vacant stall. At no time was he nearer to the plaintiff than 10 or 15 feet. Counsel for appellee, with accustomed skill, have so vividly colored the actions of the animal that but little imagination is required to visualize this docile and well-trained animal emitting fire and smoke; but our narration is an account of the important facts.

The parties have presented for our consideration a very large number of authorities. They have been examined but none discovers any principle upon which liability of either of the defendants can be placed. As applied to cases of this kind, we have announced this doctrine:

"While a proprietor or manager of a place of public amusement or entertainment is held to a stricter account for injuries to patrons than the owner of private premises generally, the rule is that he is not an insurer of the safety of patrons, but owes to them only what, under the particular circumstances, is ordinary and reasonable care." Clark v. Monroe County Fair Association, 203 Iowa 1107, 1112, 212 N. W. 163, 165.

See also Williams v. Park Association, 128 Iowa 32, 102 N. W. 783, 1 L. R. A., N. S., 427, 111 Am. St. Rep. 184; note to Frye v. Omaha & C. B. S. R. Co., 22 A. L. R. 607, at page 610; note to Waddel v. Brashear, 98 A. L. R. 553, at page 557; and earlier supplements to 22 A. L. R. and citations in current Blue Book. What is reasonable care must, of course, depend upon the nature of the particular exhibit or activity under consideration. Our attention is called to cases involving in-

juries from fireworks, shooting galleries, horse races and the like. It is not necessary that we analyze these, nor that class of citations dealing with situations created by horses which have been left unharnessed or unattended and to stray into public streets. All these are readily distinguishable from the one before us.

Our attention is directed, among other cases, to Candler v. Smith, 50 Ga. App. 667, 179 S. E. 395, as authority for the proposition that because the horse did not come in contact with the plaintiff, defendants were not thereby exonerated from liability. This case dealt with the liability of the owner of a baboon which had escaped from the defendant's zoo. The animal took possession of plaintiff's automobile, frightened and pursued her, and she fell sustaining injuries. A citation of this nature seems to overlook the distinction universally made by the courts between animals wild or *ferae naturae* and those domestic or *mansuetae naturae*. See 2 Am. Jur., Animals, section 3; 3 C. J. S., Animals, section 2. In the case of domestic animals, the rule is thus stated in 3 C. J. S., section 145:

"The owner or keeper of domestic animals is liable for injuries inflicted by them only where he has been negligent, the animals were wrongfully in the place where they inflicted the injuries, or the injuries are the result of known vicious tendencies or propensities." See also Hallburton v. Burke County Fair Assn., 119 N. C. 526, 26 S. E. 114, 38 L. R. A. 156.

Applying the principles above announced to the facts before us, we fail to see any ground upon which a verdict for the plaintiff can be sustained. It is not to be expected that two cases with the same facts could be found but the case of Beale v. McAlister Coal Co., 82 N. J. L. 151, 152, 83 A. 178, is like this in principle. In that case the defendant corporation was owner of a coalyard which adjoined the house occupied by the plaintiff. One of the defendant's drivers returned to the yard with wagon and team. There he proceeded to unharness the horses both of which were gentle. When the near horse had been entirely loosed from the wagon it started to

walk to the barn according to his usual custom. The off horse undertook to follow his mate while still attached to the wagon by the inside trace. The effect of his forward movement was to steer the wagon in a sidewise direction toward the plaintiff's property and to drive the wagon both through the fence and through the wall of the adjacent laundry shed in which the plaintiff was at work, inflicting injuries for which she seeks compensation. Defendant had owned the team for five or six years and this was the first time any trouble of this sort had occurred. On these facts a nonsuit was directed and the supreme court of New Jersey was asked to set it aside on the ground that it was improvidently made. The court said:

"We think the case made by the plaintiff exhibited no ground of liability on the part of the defendant to compensate her for the injuries she received; that the unharnessing of the team in the defendant's own yard was a lawful act goes without saying; that there was no reason to anticipate that the off horse would attempt to go to the barn before he was entirely released from the wagon, in view of his never having done so before during the whole preceding five or six years that he had been owned by the defendant, seems to us to be equally apparent. The facts, therefore, present a case in which a person has received injuries which are the result of the lawful act of another, done in a lawful manner, and without carelessness or negligence on his part. For injuries received under such conditions, the person whose act produces them is not legally responsible. Marshall v. Welwood, 9 Vroom 339 [38 N. J. Law, 339, 20 Am. Rep. 394]; Ulshowski v. Hill, 32 Id. 375 [61 N. J. Law, 375, 39 Atl. 904]."

We have expressed ourselves in a case involving similar principles, Howell v. Mandelbaum, 160 Iowa 119, 121, 140 N. W. 397, 398, Ann. Cas. 1915D, 349. There a delivery horse belonging to the defendant was being driven by a 19-year-old servant of the defendant along a street in Des Moines. The horse for some reason (balkiness, perhaps) stopped and though urged would not start. After allowing the horse to stand a

few minutes, the boy got out of the wagon, went to the horse's head, whereupon it lunged forward. The boy sprang into the wagon but did not seize the reins; and the horse in its course struck and hurt the plaintiff. A judgment against the defendant was reversed. There was no evidence of the vicious character of the animal other than that he stopped as stated and had been seen to do it once before. The court, by Ladd, J., commented:

"From this circumstance alone, it was not to be inferred that defendant was negligent in allowing the horse to be driven on the streets, nor, for that matter, the boy to drive it, and the court erred in submitting this issue to the jury. Yeager v. Railway, 148 Iowa, 231 [123 N. W. 974]. Nor does it appear that, in leaving his seat in the wagon and going to the horse's head, there was any want of care."

If the action of the defendant's servant in the Howell case could not be classed as negligent, the removal of Jerry's halter as was done here, could not be held so. The conclusion that we have thus announced makes it unnecessary that we pass on the many other questions presented in argument.

■ Appellants' motion to strike appellee's supplemental brief and argument is overruled, although the practice of extending argument beyond the permission of our rules is disapproved.—Reversed.

RICHARDS, C. J., and MILLER, STIGER, HALE, HAMILTON, and BLISS, JJ., concur.

MITCHELL and OLIVER, JJ., dissent.