JENNIE LaSELL, Appellant, v. TRI-STATES THEATRE CORPORATION, Appellee.

No. 46250.

930

SEPTEMBER 21, 1943.

Putnam, Putnam, Fillmore & Putnam, of Des Moines, for appellant.

Miller, Huebner & Miller, of Des Moines, for appellee.

BLISS, J.—Appellant's assignments of error are based upon erroneous instructions and the failure to properly instruct the jury. The appellee contends that if it be conceded the trial court so erred, it was error without prejudice, since its motion to direct a verdict because the appellant had failed to establish either negligence on the part of appellee or her own freedom from contributory negligence should have been sustained. If there is merit in the appellee's contention, it is decisive of this appeal and makes it unnecessary to pass upon the merits of the errors assigned. Some review of the record is therefore first required.

The appellant, aged sixty-four years, weighing at the time about 223 pounds, accompanied by her daughter and the latter's daughter, having paid the required admission, entered the Des Moines Theater, operated by the appellee, about five o'clock in the afternoon of June 8, 1941, to attend a moving-picture show. Patrons, after passing through the entrance traverse the lobby, foyer, and promenade, in succession, before taking their seats in the auditorium. The auditorium is approximately one hundred feet east and west, and probably somewhat farther north and south, from its rear to the screen at the north end. The main or ground floor of the auditorium con-

sists of four sections of seats, the two center sections having forty rows of seats and the side sections having two or three rows less. There are five aisles extending from the rear north to the screen aisle, number 1 being along the west wall and the other aisles being numbered consecutively to the aisle along the east wall. The entire floor of the auditorium extends from the stage toward the rear, south, on a gradually rising gradient or incline, until it reaches the third row of seats from the rear wall of the auditorium. From the elevation of this line, the level of the aisles gradually slopes downward toward the aisle entrances and coincides with the floor level of the promenade. But the level of the floor under the last three rows of seats in the auditorium, and between those parts of the aisles which slope southward and down, continues on a rising incline to the rear wall. As a result of this method of construction the passageway to the seats in the third row from the rear is on the same level as the aisle and there is no step-up from the aisle into this passageway. But to enter the passageway to the seats in the second row from the back there is a step-up of approximately five inches, which continues as a ramp or upward-sloping way, for a short distance into the passageway. Entrance from the aisle into the last row at the rear of the auditorium is in like manner except that the step-up is somewhat higher.

Appellant and her daughter and granddaughter entered the auditorium at aisle 2, the second from the west wall. An usher, with a flashlight, seated them in the second row from the rear, in the section of seats on the left or west of this aisle. The granddaughter sat in the third seat from the aisle, the appellant in the second seat from the aisle, and the daughter in the seat on the aisle and just over the step-up. None of them had any difficulty in taking her seat, and the appellant testified that she did not notice the step-up. The usher did not call their attention to the step-up. Other patrons were passing along the aisle as they came in. Patrons were entering and leaving the auditorium throughout the entertainment. The picture was shown, as is customary, in partial darkness. After they had been in the theater for about three hours, the daughter went to the rest room. She almost fell in stepping to the aisle but retained her balance. About five or ten minutes later the appellant

took hold of the granddaughter's hand with her left hand and stepped toward the aisle. Not seeing the step-down because of darkness, and not knowing of its presence, and thinking there was no change in level of the floor on which she was walking, she lost her balance when her foot went to the aisle floor, and she fell forward, striking her head on the metal seat across the aisle. She had never been in this theater before.

Her petition alleged negligence thus:

"The proximate cause of the plaintiff's injuries and damages was the negligence of the defendant in negligently permitting an uneven condition in its floor to exist, over which patrons would be likely to stumble and fall, with insufficient lighting and without warning of the danger."

The petition was in no way attacked. The answer was a general denial.

There was uncontradicted evidence that the riser of this step and about two inches in width of its tread had been repainted with white enamel paint about the end of April 1941. There was also evidence that it was repainted as it became soiled, darkened, or worn off, but no evidence of its being painted between April 1941 and June 8, 1941, the day of the injury. After taking her mother to the hospital, the daughter came back to the theater to get the name of the gentleman who had aided her mother after she fell, and to make some observations. She testified:

"The theater was dark and then the promenade was a little lighter and the main entrance was real light. When I left to go up to the rest room I didn't see the edge of the aisle and when you sit there awhile you forget about anything. When I went out of there, I staggered myself, I happened to catch myself. At that time I didn't notice any aisle lights but I know there is lights there. I did not observe any whitewashing or any white paint on the edge of the floor where it joins the aisle floor. When we were first ushered into the theater the usher did not state to Mrs. LaSell, nor me, nor any of the three of us to take note of the stepoff there. No one said anything to us upon our entrance into that theater, with reference or regard to the stepoff at the point where we were ushered into our seats."

On cross-examination she testified:

"I never seen any white stuff on there. I looked afterwards but I didn't see anything. If there was white stuff there at the time, it was awfully dirty, you couldn't see it. The light was so bad you couldn't see in there. I didn't look at the step when I stumbled but I did afterwards, that night. * * * I didn't examine it very thoroughly when I went back, but I did see there was a step there. * * * As to the carpet in front of the step, you couldn't see the carpet. I never seen any lights at that place. The lights were scattered up and down the aisle. I don't say there were no lights there at that time because I didn't see any. I didn't see the step there or I wouldn't have stumbled myself. * * * I never thought of looking down when I was leaving. I didn't think of an uneven floor, didn't think there was any necessity of it."

The appellant testified:

"When we went into the Des Moines Theater I was ushered to my seat by an usher there. He had a flashlight. It cast a light on the floor so you could see to get to the seat. * * * Within the place where the audience watches the show the interior was quite dark, just real dim lights. * * * I got up and started to walk out, and I reached back for Darlene's hand, and of course, looked at the floor, tried to look at it, but it was so dark you couldn't see the floor, so I just walked out, or started to walk out. I hadn't stepped any more than two steps, I think, until I fell just as soon as I come to the end of the seat and stepped down here, lost my balance and went headlong into the seats on the other side of the aisle. * * * At the time I got up and walked out I did not know there was any set-off where the floor goes into the aisle. When the usher ushered me into my seat he did not tell me there was a step-off there. Neither the usher or any one told me to remember that there was a step-off there when I came out. Neither the usher or any one told me that I should watch my step as I left the theater. I did not notice that condition there when I went into the seat. As I stepped out at the end of the seat not knowing that there was a step-down, I just walked right out like I was walking on a level floor, and

of course, I lost my balance and then I went right on over. The edge of the step-off was not illuminated by a light. It was dark. I could not see where the edge of the floor left and the aisle began lower. The usher did not use a flashlight to help me get out of there. * * * I tried to see, but it was so dark that you couldn't see the floor there where I came out.''

On cross-examination she testified:

''An usher took us at the door and seated us. I came into the seat I was sitting over the same path I went away on. I suppose I stepped up this step when I went into the seat but I didn't notice it. We had been out in the light when we came into the theater. * * * I noticed some lights on the posts down the side of the theater scattered along there. When we went in I noticed little dim lights down the aisle but they weren't light enough to light the aisle. The lights weren't showing on the edge of the step. There was no light on the end of the aisle [on the end seat of the aisle] * * * and if there was it was out, because there was no light there when I walked out. There was no light on that floor, it was dark there. I looked down to see where I was walking, couldn't see the floor at all. I walked out, I supposed it was all level, didn't know there was any jumpoff. I must have walked up the step when I came into the place but I didn't notice it; there were other people went in ahead of us. * * * I did not appreciate that the back portion of the theater was raised above the front portion, it was the first time I was ever in there. I didn't look around at the fixtures, and seats, and elevation, anything of that, I was looking at the picture. There was no light lighting the aisle under the seat in which Mrs. Wakefield [daughter] was sitting, if there was a light there it wasn't lit, because it was totally dark, it was plumb dark where I stepped off. The floor part was all dark. There was no white line to be seen. I supposed I was on level floor. There was no light so that you could see white if there was any white there. * * * Some of the lights on the edges of the seats show down onto the aisle and some of them are so far apart there are places in between they don't show. There is lots of space where they don't light.''

Mr. Wessels, a coal salesman and treasurer of the city of Rock Island, Illinois, was a witness for appellant. He testified:

"My wife and I were sitting in the Des Moines Theater, Sunday, June 8, 1941, * * * in the middle section in either the rear row or second from the rear row. I was on the seat next to the aisle. * * * Mrs. LaSell fell just immediately in front of me. * * * she struck her head immediately in front of the line where I was sitting. * * * An usher was a foot or two to my left in the doorway aisle at the time. [The witness carried and dragged Mrs. LaSell to a divan in the promenade.] Mrs. LaSell fell just opposite the aisle where she came out. * * * She fell in a row just opposite the row ahead of me in this other section at my left. * * * As to the condition of the interior of the theater at the time of her fall, it wasn't light, because that would interfere with the showing of the picture. I would say it was relatively dark. * * * it seems to me, beginning at a point about three or four rows from the rear, would think there was an elevation built up so that people sitting back here could see over the heads of the people sitting in front of them. Of course, that was graduated down there, wherever it started, the third or fourth row from the rear. It was almost level with the aisle, and of course, tapered up in this manner. I would say that curb in the rear must have been about six inches high, I am just guessing, it tapered from nothing up to about six inches in the back. The floor upon which the seats are placed is level with the aisle at about the fourth row from the back, but from that place, then to the back of the theater the floor where the seats are placed rises higher than the level of the aisle. There is about a six inch curb in the vicinity of where I and Mrs. LaSell were. They had little lights that seemed to be staggered up and down the aisle, one on this row, one there and one here. * * *. They of course were not very bright. The lights were shielded from the top to deflect the lights to the floor so they don't interfere with anybody's vision. * * * They weren't bright. I would say a very small candlepower bulb in there. Perhaps don't provide much illumination, perhaps provides nothing, I don't know. Q. Did those lights illuminate the edge of the curb at the level of the floor where it was ele-

vated above the aisle floor? A. Well perhaps the best way to answer that, after I came back from carrying Mrs. LaSell * * * I recall coming back and feeling with my foot so I would get it high enough to go into the aisle. I didn't feel the illumination was adequate, or perhaps the pupils of my eyes had [not] become dilated so I could see inside. I remember feeling for the curb, so I could get in and take my seat again. * * * People would come and go during the performance. * * * I would say they [aisle lights] appeared to be about the same as other theaters I have been in. * * * Either the row of seats in which Mrs. LaSell was had an aisle light or there was one on the row straight across, I don't recall which. * * * There were lights in the aisle, whether a light right there, I wouldn't say. * * * I was one row back of the place from which Mrs. LaSell emerged and across the aisle. * * * I felt with my foot, I didn't feel the visibility was so good I could just walk into my seat.''

Witnesses for the appellee testified: A balcony, about ten feet above the floor covers the three back rows in the auditorium; the distance from the rear of one row of seats to the rear of another row is thirty-two inches; there are four clusters of lights in the ceiling of the promenade; there are eight posts in the aisles along the east-and-west walls, and on each post a 40-watt light in straw-colored glass; there were two similar lights on each side of aisle 3 in the middle of the back wall; there were six lights on each side of an aisle, each about six rows of seats apart—the twelve lights being alternated on each side of the aisle; these lights were 10-watt bulbs with clear glass, placed on the aisle side of an end seat, completely covered with a metal hood, which had a grilled or barred opening at the bottom; this hooded light was placed just below the arm of the seat about two feet above the aisle floor; there was such a fixture on the aisle seat of the second row in which the appellant was sitting, and also one in the seat across the aisle; these cast a light about a 40-inch arc, and would cover the white portion of the step; immediately under the end seat of this second row, just south of the step in question, and sunk in a recess of the concrete which forms the vertical plane of the riser of the step, was a frosted 15-watt bulb; across the face of the recess and

protecting the globe was a metal plate with a slotted grill about four inches square, the louvers or slats of which were at a diagonal pitch,. casting the rays of light downward; there was an exit light inside, above the aisle entrance; the light from the promenade would diffuse some light into the aisle about as far as the third row from the back, if the aisle entrances were open; these entrances were closed when the seats along an aisle were filled. The foregoing testimony was given by appellee's electrician and its assistant manager. The latter was in the lobby or foyer when the appellant was injured and first saw her on the davenport in the foyer. He testified that the aisle light on the end seat of the row in which appellant was seated was burning, as was also the light down in the concrete, and another aisle light lower down the aisle but not directly across, when he went back and checked the scene of the accident. He also testified that it requires semidarkness in order to properly see a motion picture, and that you cannot have a satisfactory picture with normal illumination. No usher or anyone else testified for the appellee, respecting the above matters, excepting a theater architect, who stated that:

"Where it is necessary to have the level of the floor on which the seats were placed above that which the aisle runs on, a step between the aisle and the floor on which the seats are placed is an approved method of construction."

On July 8, 1941, a picture of the step was taken. It was received in evidence without objection. It quite clearly shows the end seat, step, and surroundings. But the view which impressed itself on the film of the camera, and is reproduced on the photograph, is a much clearer and more definite view than was disclosed to the eyes of the appellant and her witnesses at the time of her fall. Their eyes saw it with the light which we described herein, while the eye of the camera saw it in the rays of all of the theater lights, and of the photographer's 2,500-watt floodlight, augmented by a flashlight bulb. This photograph, Exhibit No. 1, was certified to this court.

In rebuttal, a sixteen-year-old boy, who was sitting just a few seats ahead of appellant and across the aisle, testified in

her behalf. He assisted in removing her from the aisle when she fell and then came back into the theater. He said:

"The picture Exhibit '1' is not correct in two respects. The illumination, of course, to take the photograph is a great deal greater than lighting they have when they show a moving picture, I believe that is necessary, and the other thing, I would say the white enamel on the step here I don't believe it showed up that plain. I didn't see any enamel, it could have been covered up or was dark, I couldn't see it, but I saw none there, as to the conditions of visibility when I made the observation I would say that this was rather poorly lighted, there was a light there in that vicinity and some light coming from the door into the lobby there, but it was insufficient as far as I was concerned if I were coming out of that seat. As I recall the dim light that lit the aisles did not light the top of the step. This picture Exhibit '1' does not show such lights and shadows as were there at the time I made the observation. This picture does not show the situation as I viewed it on my eye at the time; that shows more than I saw because there is more light on that. * * * I do not recall as to where any of the lights in the aisle set. I don't remember whether there were lights on the seat at that place. I do remember there were lights set in the concrete."

Appellee introduced a statement signed by this witness and procured, apparently, by an investigator of its insurance carrier, but it in no way impeaches the witness nor impairs his testimony.

I. We have set out the substance of the testimony which bears upon the issues of negligence and contributory negligence, and upon the pleaded allegations of faulty construction, insufficient lighting, and lack of warning. It is our judgment that appellee's motion to direct was rightly overruled and that all such issues and questions of fact were for the determination of the jury.

It is a well-recognized principle, needing no citation of authority in support thereof, that the appellee, in moving for a directed verdict, must be considered as admitting the truth of all evidence offered by appellant and every favorable inference fairly and reasonably deducible therefrom.

There is a conflict in the evidence as to the existence and

the adequacy of the lighting, and as to the visibility of any painting on the step. The appellant and her daughter testified that it was so dark that neither the floor nor the step was seen by them. Two strangers to the appellant testified to facts supporting the testimony of appellant and her daughter respecting the absence of lighting and the nonvisibility of any painting, and also, without objection, gave their opinions as to the inadequacy of the lighting at the step and vicinity. One of them, sitting in an aisle seat across the aisle and one row back from the row in which appellant was sitting, which seat was reached by a similar step, returning to it after assisting the appellant, testified:

"I recall coming back and feeling with my foot so I would get it high enough to go into the aisle [meaning the passageway between the rows]. I didn't feel the illumination was adequate. * * * I remember feeling for the curb, so I could get in and take my seat again. * * * I felt with my foot, I didn't feel the visibility was so good I could just walk into my seat. * * * I couldn't say the aisle was lighted, as I recall it, but I don't believe the floor level on which the seats were situated was lighted, I don't think that is the case. I believe that is true."

Speaking of this step, appellee's witness, the theater architect, testified:

"It would not be a safe method of construction for the use of patrons if there were no lights to reveal the stepoff from the floor level of the seat to the floor level of the aisle. I think there should be lights and painted. I think you would want both of them, good practice would probably dictate that."

The hooded aisle-seat light and the light in the concrete recess were of small candle power. The globe of the latter was frosted. The recess was covered by a grill. It was located where dust would be continuously settling while the theater was in use. Its location, a short distance removed from the step, lower than its tread and on the same vertical surface of the concrete as the riser, prevented it from casting much, if any, light on the step. The question of reasonable lighting, under the circumstances, was certainly for the jury to determine.

Of a similar situation, in Vale v. Indiana County Theaters Co., 3 Cir., Pa., 120 F. 2d 495, 497, where there was a six-inch drop in the floor level of the rest room and the floor of the foyer, the court, in affirming judgments for plaintiffs (wife and husband), said:

''The defendant's negligence lay in its failure to light the step sufficiently so that it was readily observable to invited users. That such was the defendant's duty is indicated by the Haddon case [Haddon v. Snellenburg, 293 Pa. 333, 143 A. 8] where it was expressly pointed out, 293 Pa. pages 336, 337, 143 A. page 9, that 'where such difference in elevation exists, the place should be sufficiently lighted artificially to enable users to see the step, unless lit by daylight.' * * * Certainly, the law furnishes no standard by which the court could have determined whether the light in the room was sufficient to reveal the step to one entering therein. The trial court properly declined to base a conclusion of law upon unknown factors and assumptions. * * * The question of the defendant's negligence was peculiarly for the jury.''

With respect to the allegation that no warning was given the appellant, the record shows without dispute that the only warning, or attempt to give warning, was such as may have been given by the lighting and the painting and the use of a flashlight by the usher in directing the appellant and her companions to their seats. No verbal notice was given to them by the usher or by anyone else at any time. Whether warning was given and whether it was sufficient was for the jury to pass upon.

Respecting the allegation of negligence in maintaining the uneven floor, or step, there is no denial other than might be in the general denial of the answer. Appellee, by evidence and by argument, admits the existence of the step, and asserts that it was necessary and was an approved method of construction. The probative value of this testimony was greatly weakened, if not destroyed, by proof that, after appellant's injury, under the direction and advice of the theater-architect witness who gave this testimony for appellee, the steps were removed from these two rows of seats—the last two rows on the ground floor —and ramps were substituted for the steps.

One ground of appellee's peremptory motion for a directed verdict is:

"4. The theatre is constructed and lighted in an approved manner, and in accordance with the customary method of lighting and constructing theatres of similar character and nature."

Appellee cited Rynn v. Fox-New England Theatres, 299 Mass. 258, 12 N. E. 2d 728 (directed verdict for defendant); Givens v. De Soto Bldg. Co., 156 La. 377, 100 So. 534 (judgment for defendant on jury verdict); Suggs v. Saenger Theatres, 15 La. App. 142, 130 So. 817 (nonsuit against plaintiff); Foran v. Buffalo Palace Corp., 237 N. Y. 599, 143 N. E. 758 (nonsuit against plaintiff); Peck v. Yale Amusement Co., Mo., 195 S. W. 1033 (directed verdict for defendant). Of these authorities, the appellee states:

"Appellee respectfully submits that the above cases hold as a matter of law that it was not per se faulty construction for appellee to place the seats of the auditorium or theatre at a higher level than the aisle between them as such arrangement has advantages which are obvious; that there is nothing uncommon in this form of construction * * *."

We call attention to other cases not cited by appellee, some of which give support to its contention that if the lighting or the elevated-seat construction of a moving-picture theater, defendant in a case of this kind, is in accordance with the customary method of lighting or constructing theaters of similar character and nature, such defendant is not negligent in either respect, as a matter of law, since such a prevailing practice, or approved method, in itself, furnishes the legal standard, test, or measure of the duty or care which such theater owner or operator owes to his invitee or patron for the latter's safety. Such other cases are Rosston v. Sullivan, 278 Mass. 31, 179 N. E. 173; Miller v. Poli's New England Theatres, 125 Conn. 610, 7 A. 2d 845; Falk v. Stanley Fabian Corp., 115 N. J. Law 141, 143, 178 A. 740; Bergstresser v. Minnesota Amusement Co., 68 S. D. 579, 5 N. W. 2d 49, 143 A. L. R. 53; Falso v. Poli-New England Theatres, 127 Conn. 367, 17 A. 2d 5; Osborne v. Loew's Houston Co., Tex. Civ. App., 120 S. W. 2d 947; Johnson v.

Mathews-Moran Amusement Co., 164 Or. 636, 102 P. 2d 703, 705; Gunn v. Saenger-Ehrlich Enterprises, La. App., 192 So. 744.

██ One witness testified that the lighting in appellee's theater was like that which he had seen in other moving-picture theaters. There was also testimony that the use of a step to reach a row of seats was approved construction. All of this testimony was admitted without objection. We do not agree with the contention of appellee that because its lighting and construction were in accord with the customary or standard practice of theaters generally in these respects, these issues of alleged negligence were issues of law for the court rather than issues of fact for the jury. The standard of custom cannot be substituted for the legal standard of reasonable or ordinary care under the circumstances. Following an approved method is merely evidentiary and is not conclusive on the question of ordinary care. The standard of care is ordinary care under the circumstances, and not what others have done under like circumstances. Habitual practice of any number, for any period of time, cannot make a negligent act an act of due care and caution. In Walgreen Texas Co. v. Shivers, Tex. Civ. App., 131 S. W. 2d 650, 657, the court quoted from French v. Southwestern Telegraph & Telephone Co., Tex. Civ. App., 162 S. W. 406, 408, as follows:

" 'The fact that appellee and other companies had habitually and customarily used the same does not, of itself, show that they had exercised ordinary care. * * * "Evidence of such use by other persons engaged in the same kind of business is admissible upon the issues of ordinary care, but the question * * * is whether, under the facts of the particular case, there has been an absence of ordinary care." ' " [Lyon v. Bedgood, 54 Tex. Civ. App. 19, 117 S. W. 897, 900.]

The rule was tersely stated by Justice Holmes in Texas & Pac. Ry. Co. v. Behymer, 189 U. S. 468, 470, 23 S. Ct. 622, 623, 47 L. Ed. 905, 906, thus:

"What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not."

In Farris v. Interstate Circuit, 5 Cir., Tex., 116 F. 2d 409, 411, it was not a question of proper lighting, but of proper construction in a moving-picture theater. The elevated portion of the floor on which row of seats and passageway in front of them was located was raised four to six inches higher than the platform in the row ahead. Plaintiff, in passing down to the aisle, caught her heel between the raised edge of the passageway and the leg of a seat in the row ahead. Judgment for defendant notwithstanding verdict for plaintiff was reversed because unqualified so-called experts were permitted to testify that the theater was constructed according to standard and approved design, and was reasonably safe. The court said:

"If it be conceded that the theatre was constructed after a universal custom and long-followed design, it does not necessarily follow that such care was taken as reasonable prudence would require." Citing Wabash Ry. Co. v. McDaniels, 107 U. S. 454, 2 S. Ct. 932, 27 L. Ed. 605, opinion by Justice Harlan; Hellweg v. Chesapeake & Potomac Tel. Co., 71 App. D. C. 346, 110 F. 2d 546, and other cases.

The rule is aptly stated by the able court of the second circuit, speaking through Judge Learned Hand, in The T. J. Hooper, 60 F. 2d 737, 739, 740. The owners of cargoes in towed barges sued the barge owners and tug owners for the loss of the cargoes through the negligence of the defendants in not having radio receiving sets through which they would have been warned of the approaching storm. The defendants contended that it was not the general practice to carry such sets. In affirming judgments for plaintiffs, the court said:

"Is it then a final answer that the business had not yet generally adopted receiving sets? There are, no doubt, cases where courts seem to make the general practice of the calling the standard of proper diligence; we have indeed given some currency to the notion ourselves. Ketterer v. Armour & Co. (C. C. A.) 247 F. 921, 931, L. R. A. 1918 D, 798; Spang Chalfant & Co. v. Dimon, etc., Corp. (C. C. A.) 57 F. (2d) 965, 967. Indeed in most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available

devices. It never .may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.'' Citing Shandrew v. Chicago, St., M. & O. R. Co., 8 Cir., Minn., 142 F. 320, 324, 325, and other cases.

Speaking of evidence of customary conduct and standard methods, Wigmore on Evidence, 3d Ed., 488, 489, section 461, says:

''The proper method is to receive it, with an express caution that it is merely evidential and is not' to serve as a legal standard.''

In Smith v. Penn Federal Corp., 315 Pa. 20, 23, 172 A. 147, 148, an action for damages against defendant as the operator of a moving-picture show, based on inadequate lighting in view of the construction of the theater at the place of plaintiff's fall, there was a judgment for defendant on the jury's verdict, which was affirmed. The court said:

''There is nothing in the complaint that defendant's witness was permitted to testify that the type of lighting in the theatre was 'in accord with the best known practice in [his] profession in theatre lighting'; the value of his evidence as to the use of the shaded light at the end of the second last row of seats, referred to above, was for the jury.''

In James v. Rhode Island Auditorium, 60 R. I. 405, 414, 199 A. 293, 298, there was judgment on a verdict for plaintiff, and exceptions were overruled. The court said:

''The defendant, relying upon the testimony of its expert, argues that it discharged its full duty to its invitees when it constructed its rink like other hockey rinks in various cities. We do not agree with this contention. The practice in other places and the opinion of the expert in this case are circumstances entitled to proper consideration as evidence, but they are not conclusive.'' Cited in Thurman v. Ice Palace, 36 Cal. App. 2d 364, 97 P. 2d 999.

946

Respecting similar testimony, in McCartan v. Park Butte Theater Co., 103 Mont. 342, 62 P. 2d 338, the court held that the issue as to lighting was for the jury.

The decisions of this court are fully in accord with the sound and general rule announced by the various courts above noted. We have held that what others in the same line of business have been accustomed to do in any particular is not in itself a standard of care, but is evidence only of that standard, which the jury may consider, under proper instructions, in determining whether the defendant exercised ordinary care. See Kirby v. Chicago, R. I. & P. Ry. Co., 150 Iowa 587, 590 et seq., 129 N. W. 963; Korab v. Chicago, R. I. & P. Ry. Co., 165 Iowa 1, 11, 12, 146 N. W. 765, Ann. Cas. 1916E, 637; Middleton v. City of Cedar Falls, 173 Iowa 619, 622 et seq., 153 N. W. 1040; Hall v. Chicago, R. I. & P. Ry. Co., 140 Iowa 30, 32, 116 N. W. 113; Austin v. Chicago, R. I. & P. Ry. Co., 93 Iowa 236, 61 N. W. 849.

When any method of theater lighting or construction is sought to be established *by expert-opinion testimony*, the probative value of such testimony is for the jury. Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N. W. 2d 646.

The appellant was rightfully upon the premises. Appellee had received its admission charge for her and she was in the theater as its invitee. It is a general rule, recognized without dissent, that an owner or occupant of buildings or premises, who directly or impliedly invites or induces others to enter therein, owes an active, affirmative duty to such persons to use reasonable, ordinary care to keep such premises in a reasonably safe condition, so as not to unreasonably or unnecessarily expose them to danger. Citation of authority sustaining this principle is not necessary, but we mention a few of our own decisions and other authorities. See Osborn v. Klaber Bros., 227 Iowa 105, 107, 287 N. W. 252; Nelson v. Smeltzer, 221 Iowa 972, 975, 269 N. W. 924; Noyes v. Des Moines Club, 178 Iowa 815, 821, 822, 160 N. W. 215; Upp v. Darner, 150 Iowa 403, 407, 130 N. W. 409, 32 L. R. A., N. S., 743, Ann. Cas. 1912D, 574; Graham v. Ochsner, 193 Iowa 1196, 1200, 188 N. W. 838; Whitman v. Chicago G. W. Ry. Co., 171 Iowa 277, 283–287, 153 N. W. 1023; Wilsey v. Jewett Bros. & Co., 122 Iowa 315, 319, 98 N. W. 114; Blakeley v. White Star Line, 154 Mich. 635, 118

N. W. 482, 19 L. R. A., N. S., 772, 129 Am. St. Rep. 496; 3 Cooley on Torts, 4th Ed., 186, section 440; 47 C. J. 826, section 237; 20 R. C. L. 55, 56, sections 51, 52; II Restatement of the Law, Torts, 932, 938, sections 342, 343.

█ The general rule above stated applies in full force to the operators of places of public amusement of all kinds, operated for profit, including moving-picture theaters. As stated in Emery v. Midwest Amusement & Realty Co. (operating a moving-picture show), 125 Neb. 54, 58, 248 N. W. 804, 805:

"So, too, the approved rule appears to be: 'Ordinary or reasonable care on the part of a proprietor of a theater or moving-picture theater to keep the premises in a reasonably safe condition requires the exercise of reasonable care in lighting the aisles, stairways, etc.; and this is such lighting as an ordinarily prudent person would have furnished under the same or similar circumstances, that is to say, taking into consideration the purpose for which the theater was used and having due regard for the safety of patrons. * * *'" (Quotation from 62 C. J., Theaters and Shows, 869, section 56.)

Decisions sustaining the above-stated rule and holding the operators of moving-picture theaters to the duty of reasonable, ordinary care in properly lighting all parts of the theater to which the patrons are invited, and maintaining seats, aisles, stairways, and equipment in a reasonably safe and suitable condition for their patrons, and allowing recovery for the breach of this duty, are: Farris v. Interstate Circuit, supra, 5 Cir., Tex., 116 F. 2d 409, 411 (seat on platform elevated four to six inches); Central Amusement Co. v. Van Nostran, 85 Ind. App. 476, 152 N. E. 183, 184, 185, 154 N. E. 390 (step of three or four inches from aisle to seat); Magruder v. Columbia Amusement Co., 218 Ky. 761, 292 S. W. 341, 342 (floor occupied by seats four or five inches above aisle); Standard Theaters Corp. v. Hughes, 185 Okla. 377, 91 P. 2d 1058, 1062 (floor occupied by seats four inches above floor of adjoining aisle; defendant required to exercise "a high degree", of care to plaintiff to keep its premises in a safe condition); Branch v. Klatt, 165 Mich. 666, 131 N. W. 107, 109 (an insufficiently lighted stair-

948

way); Oakley v. Richards, 275 Mo. 266, 276, 204 S. W. 505, 507 [error dismissed 248 U. S. 541, 39 S. Ct. 134, 63 L. Ed. 411] (floor occupied by seats four inches above aisle). The court said: " 'It is a matter of common knowledge' that a four-inch depression in a floor 'is sufficient to cause one to fall' who, in the absence of light and knowledge of its presence, steps into or upon the edge of it." Citing New Theater Co. v. Hartlove, 123 Md. 78, 86, 90 A. 990 (three and one-half inch drop from seat floor); Dondero v. Tenant Motion Picture Co., 94 N. J. Law 483, 110 A. 911, 912 (steps not sufficiently lighted); Andre v. Mertens, 88 N. J. Law 626, 96 A. 893–895 (balcony stairway not sufficiently lighted); Haugh v. Harris Bros. Amusement Co., 315 Pa. 90, 172 A. 145 (dimly lighted balcony stairs); Emery v. Midwest Amusement & Realty Co., supra, 125 Neb. 54, 248 N. W. 804, 805 (plaintiff stepped on an unlighted stairway in a balcony without knowing its close proximity to her); Coleman v. Washington Theatre Co., 294 Mich. 343, 293 N. W. 674 (dimly lighted balcony stairway); Birmingham Amusement Co. v. Norris, 216 Ala. 138, 112 So. 633, 53 A. L. R. 840, 843 (collapse of seat); Rutherford v. Academy of Music, 87 Pa. Super. 355 (dark corridor leading to gallery); Denham Theatre v. Beeler, 107 Colo. 116, 109 P. 2d 643 (dimly lighted stairway and aisle in balcony); Maxfield v. Fox Kansas Theatre Co., 152 Kan. 716, 107 P. 2d 685, 687, 688 (caught heel in hole in carpet in dimly lighted balcony); Vale v. Indiana County Theaters Co., supra, 3 Cir., Pa., 120 F. 2d 495, 497 (six-inch drop in floor of dimly lighted foyer to floor in rest room); Castino v. Di Menzo, 124 N. J. Law 398, 11 A. 2d 738, 739 (six- or seven-inch step in floor of dimly lighted box); Purdy v. Loew's St. Louis Realty & Amusement Corp., 220 Mo. App. 854, 294 S. W. 751, 753 (step-off in alley exit); Bennetts v. Silver Bow Amusement Co., 65 Mont. 340, 211 P. 336 (floor occupied seats raised above level of aisle four inches in the front and eight inches in the back—dimly lighted); Keenan v. E. M. Loew's, Inc., 302 Mass. 309, 19 N. E. 2d 37 (defective seat); Tovey v. G. E. Lothrop Theatres Co., 288 Mass. 346, 193 N. E. 19 (tripped over defective carpet in balcony aisle); Bavosi v. Interstate Theatres Corp., 307 Mass. 124, 29 N. E. 2d 688 (foot struck tarry substance in dimly lighted aisle in balcony, caus-

ing plaintiff to stumble over step); Bass v. Southern Enterprises, Inc., 32 Ga. App. 399, 123 S. E. 753 (seat elevated on a platform five or 6 inches above the aisle); Henry v. Publix Theaters Corp., Tex. Civ. App., 25 S. W. 2d 695, 697 (plaintiff injured by person falling from balcony because of narrow aisle and low railing); Olsen v. John Hamrick's Tacoma Theatres, 9 Wash. 2d 380, 115 P. 2d 718 (plaintiff, sixty-seven years old, in leaving seat on floor elevated eleven inches above aisle, spanned by a nine-inch step, painted white, and a two-inch step, dimly lighted, stumbled and fell); Griffen v. Cascade Theatres Corp., 10 Wash. 2d 574, 117 P. 2d 651 (patron stumbled over display sign protruding over rubber mat in lobby); Trame v. Orpheum Theatre Co., 60 Ohio App. 323, 21 N. E. 2d 178, 180 (plaintiff, in going from her seat to the rest room, fell over a six- and one-half-inch rise in the floor of a dimly lighted corridor over that of the rest-room floor); Poppleston v. Pantages Minneapolis Theatre Co., 175 Minn. 153, 155, 220 N. W. 418 (plaintiff, in going from seat to rest room, fell on an insufficiently lighted stairway—the court saying: "A stairway, unless properly lighted, may be a source of danger, especially for persons who are not accustomed to use it."); McCartan v. Park Butte Theater Co., supra, 103 Mont. 342, 62 P. 2d 338 (plaintiff and her four children were being conducted to a balcony seat by an usher with a flashlight. A step eight inches long extended into the aisle, on which they walked from an aisle between the rows of seats, over which she stumbled. The defendant claimed that the theater was lighted in the manner approved and practiced by theaters generally.); Fox Tucson Theatres Corp. v. Lindsay, 47 Ariz. 388, 56 P. 2d 183, 185 (plaintiff, in going from a dimly lighted lounge up three steps to a lavatory, fell); Majestic Theater Co. v. Lutz, 210 Ky. 92, 275 S. W. 16 (plaintiff slipped on highly polished marble steps leading from promenade to the first floor. Experts testified the steps were constructed according to approved methods and good building practices); Texas Consolidated Theatres v. Pittman, 5 Cir., Tex., 93 F. 2d 21, 23 [certiorari dismissed 305 U. S. 3, 59 S. Ct. 40, 83 L. Ed. 5] (plaintiff fell on defectively laid carpet on concrete stairs).

Respecting the duty of theater proprietors to safeguard

their patrons, the authors of "The Law of Motion Pictures and the Theatre" (1917), 299, section 92, after stating that they are not insurers and are required as a general rule to exercise reasonable care and prudence in maintaining their premises in a safe condition, say:

"In many of the states the measure of this duty has been defined as analogous to that owed by the owner of a tenement house. The trend of the decisions, however, has of late years been away from this doctrine, and indications are not wanting that a *high* degree of care is imposed upon the proprietor, in keeping with the peculiar conditions that exist when great crowds gather for the purpose of recreation and amusement."

Speaking of tripping in darkened theaters, aisles, steps, and exits, the authors state at pages 306–308, section 95:

"The case of Branch v. Klatt [165 Mich. 666, 131 N. W. 107] has laid down the best rule of all the reported decisions with respect to the liability of the theatre proprietor when his theatre is darkened during a performance. It holds that the patron, in such case, has the right to rely on the premises being in safe condition, and that his duty is lighter than that of a pedestrian. That is an eminently sensible doctrine, and should be followed in all the states. Unfortunately it is not."

Marchetti on the "Law of the Stage, Screen and Radio" (1936), 302, chapter 5, section 145:

"He who solicits and invites the public to his resorts must have them in a reasonably safe condition, and not in a condition to risk the lives and limbs of his visitors."

This court has not heretofore passed upon the particular issues involved herein, with respect to moving-picture theaters, but has ruled upon the duty owing patrons at places of public entertainment, in Williams v. Mineral City Park Assn., 128 Iowa 32, 102 N. W. 783, 1 L. R. A., N. S., 427, 111 Am. St. Rep. 184, 5 Ann. Cas. 924; Clark v. Monroe County Fair Assn., 203 Iowa 1107, 1112, 212 N. W. 163, 165, and Coakley v. Dairy Cattle Congress, 228 Iowa 1130, 1134, 293 N. W. 457, 459. The

rule of care announced in the second case, and reannounced in the last case, is as follows:

" 'While a proprietor or manager of a place of public amusement or entertainment is held to a stricter account for injuries to patrons than the owner of private premises generally, the rule is that he is not an insurer of the safety of patrons, but owes to them only what under the particular circumstances, is ordinary and reasonable care.' " (Italics ours.) The italicized portion states the rule in Nebraska. Emery v. Midwest Amusement & Realty Co., supra, 125 Neb. 54, 248 N. W. 804.

There has been a tendency by a few courts to depart from the sound general rule of reasonable or ordinary care and prudence owing to invitees and patrons, as it applies to moving-picture exhibitors, with respect to lighting their theater auditoriums, by lessening and lightening that duty. The reason urged therefor is that, since the pictures are best viewed in partial darkness, the exhibitors may fulfill their legal obligation for the safety of their patrons by keeping the lighting at the maximum, least interfering with the presentation of the pictures. In other words, the interests of the exhibitors, and the better enjoyment of the patrons are given preference over the safety of the latter with respect to their lives and limbs. This doctrine was first announced, as we believe, in Rosston v. Sullivan, supra, 278 Mass. 31, 35, 179 N. E. 173, 175. The Massachusetts court there said:

"While pictures were being shown the defendant violated no duty to the plaintiff if the condition of light was that ordinarily used in exhibiting moving pictures to enable the audience to get a reasonably clear view of the image thrown on the screen. * * * The defendant undoubtedly had a duty to turn on the house lights for the convenience of its patrons within a reasonable time after the show was over."

The courts take judicial notice that it is the common practice of moving-picture exhibitors to permit patrons to enter and leave the theater at all times during the show.

The rule of the Rosston case is adopted in Falk v. Stanley Fabian Corp., supra, 115 N. J. Law 141, 142, 178 A. 740, 741.

The court, after commenting that there could be neither too much light nor too much darkness, said:

"Where is the line that marks ordinary care? Is it to be determined in each specific instance as an isolated fact without regard to standard equipment or prevailing practice? We think not. Grave difficulties would attend such a course, for it appears that the degree of illumination must be something of a compromise between two opposing objectives—successful showing of the picture, which calls for darkness, and the safety of those for whom the entertainment is provided, which calls for light. The misadventures that may befall persons moving about in a darkened room are legion, both in number and variety of incident."

The opinion ties in the rule with the other rule discussed herein, and advocated by the appellee, that the legal standard of care is the standard of customary practice, for it states:

"To hold otherwise would vary the result with each case and subject a moving picture operator to the danger of being found guilty of negligence no matter what plan of lighting he adopted."

The Connecticut court subscribed to this same doctrine in Miller v. Poli's New England Theatres, supra, 125 Conn. 610, 615, 7 A. 2d 845, 847, saying:

"Under the general rule of duty the issue is not to be decided solely upon the degree of visibility afforded an individual patron, as an isolated fact, without regard to the necessities arising from the nature of the entertainment, and as to these prevailing practice appears to afford a logical standard or test."

That court, in Falso v. Poli-New England Theatres, supra, 127 Conn. 367, 370, 371, 372, 17 A. 2d 5, 6, 7, found this test was not applicable in doing justice to the injured patron, for whom a favorable judgment was affirmed. Evidently the plaintiff offered no express testimony that the lighting was not in accord with the usual standard, since the opinion states:

"The defendant's principal contention as summarized in

its brief is that there was 'no competent evidence upon which to predicate a finding of non-compliance with or deviation from standard practice.' "

But instead of such evidence, the plaintiff, by testimony of tests made by an electric cell photometer showed that at the place of the fall the instrument registered "less than one tenth of a foot candle," that is, less than one tenth of the light given by a one-candle-power light located one foot therefrom—which was practically no light. The opinion also discloses that the stairway was covered by a wine-colored carpet which absorbed eighty per cent and reflected twenty per cent of the light falling upon it. The court therefore held:

"That test [prevailing practice] is not exclusive * * *. Under such circumstances [the particular facts in the case] the test of that care which an ordinary reasonably prudent man would exercise under the circumstances is adequate without resort to that of the standard practice urged by the defendant."

The impracticability and the probative weakness of the standard-practice test of negligence is made manifest when you consider the great variety of theater construction; the diversity of lighting in capacity and shading; the variety, presence, and absence of balconies, pillars, etc. which cast shadows; the reflecting powers of the carpeting, tapestries, wall coloring; and numerous other factors. There is ordinarily no absolute test, where human conduct is a controlling factor, of either negligence or due care in a particular instance, unless it is by statute or statutory construction. In Gunn v. Saenger-Ehrlich Enterprises, supra, La. App., 192 So. 744, 745, plaintiff was injured in passing down a dimly lighted stairway to a lavatory. Judgment dismissing his petition was reversed. The quotation of the Louisiana Court of Appeals respecting proper lighting in the auditorium is a bald, though rather equivocal statement of this rule, to wit:

"It is evident that a motion picture theater, from the very nature of its business, *while a picture is being projected, is not required to provide lighting in its auditorium, balcony and gal-*

*leries of sufficient illumination to allow its patrons to see their way to, locate and occupy seats as is the case in other places of public amusement.* The reason for this is obvious. To do so would necessarily interfere with the satisfactory projection of the picture on the screen, thus depriving patrons of the benefit of that for which they pay admission to see. There is, however, a duty upon the theater management to furnish as much light as may be consistent with its duty toward its mass patrons." (Italics ours.)

Supposing one of these patrons who has paid his money to see the show feels that he should go to the lavatory, or he desires to change his seat, or to answer a telephone or other call, or he wishes to leave the show, while the picture is being projected, or enters the theater during that time. Does he take the risk of injury from hazards existing because there is not "sufficient illumination to allow its patrons to see their way"? We cannot subscribe to any doctrine which would require him to assume all liability for such risk. The Oregon court, which favors the "standard practice" theory, nevertheless states, in Johnson v. Mathews-Moran Amusement Co., supra, 164 Or. 636, 642, 102 P. 2d 703, 705:

"We agree with respondent [plaintiff] that, while the theater is in darkness, the operator thereof must exercise reasonable care to see that patrons reach their seats in safety."

As said in Rutherford v. Academy of Music, supra, 87 Pa. Super. 355:

"But it is a matter of common knowledge that it is the practice of the proprietors of theatres and moving picture establishments to protect patrons against this necessary darkness by equipping ushers with flash lights and requiring the ushers to assist the patrons when they enter such a place of entertainment when it is dark. The law required this defendant to do nothing unreasonable. Reasonable protection to plaintiff under all the circumstances is the measure of its responsibility."

It would have been no unreasonable burden for the appellee to have discontinued the use of the two rows of seats containing

the dangerous steps. They constituted approximately one twentieth of the main floor seating capacity. Their discontinuance might have reduced the net income slightly, but it would have entirely eliminated the danger. As it was, after the appellant was injured, on the advice and under the direction of its expert witness, who would not say whether the danger was thereby lessened, the appellee replaced the steps with ramps. When one goes into a hazardous business—and it must be conceded that a darkened theater has its hazards—he must take that into consideration, and assume the burdens, and take the precautions which a reasonably and ordinarily prudent person would use under all of the circumstances. The fact that partial darkness is essential to the conduct of the business does not exempt him from this duty of reasonable care, nor does it lighten his burden thereunder. In fact, it requires him to increase his care and watchfulness, if necessary, to make it commensurate with and in proportion to the patent and to the reasonably expectable and foreseeable dangers which may injure his invitees and patrons. Such increased care, nevertheless, is nothing more than the legal standard of ordinary, or reasonable, care. This well-known rule needs no citation of authority.

In Olsen v. Edgerly, 106 Ind. App. 223, 231, 18 N. E. 2d 937, 940, the court, after mentioning the necessity of a darkened theater, said:

"This would not, however, excuse the proprietor or operator or owner from the duty to use ordinary and reasonable care to keep the premises in a reasonably safe condition for its patrons, and this would require that the aisles, stairways and other places used by the patrons be kept reasonably lighted taking into consideration the purpose for which the theatre was used *and having due regard for the safety of the patrons.*" (Italics ours.)

The same thought is expressed by Judge Phillips, speaking for the Circuit Court of Appeals, in Whitham Construction Co. v. Remer, 10 Cir., Okla., 93 F. 2d 736, 738, thus:

"The duty is that of exercising reasonable care, whether the business is comparatively safe or is extremely dangerous * * *. 'Occupations, however important, which cannot be con-

ducted without necessary danger to life, body, or limb, should not be prosecuted at all without all reasonable precautions against such dangers * * *.' [Mather v. Rillston, 156 U. S. 391, 399, 15 S. Ct. 464, 467, 39 L. Ed. 464.]''

The issue of appellee's negligence was for the jury.

■■■ Was the appellant contributorily negligent as a matter of law? We are satisfied that she was not. Appellee had invited her to its theater and had accepted her as a paying patron. As such invitee she had the right to assume that the theater was reasonably safe for her. The party of three was met by an usher who seated them scarcely six feet from the door. She had come from the daylight through the lighted lobby, foyer, and promenade. Her eyes could hardly have been accustomed to the darkness of the auditorium. The usher had a flashlight, but the granddaughter was first ushered into the seat passageway, followed by the appellant. Her attention was not called to the step by the usher. Appellant testified she passed over the step without noticing it, which might very well be. She could reasonably assume that appellee would not admit her to a darkened theater to which she was a stranger without warning her of any dangers underfoot. In the absence of knowledge or warning of danger, she was not required to be on the lookout for dangers not reasonably to be apprehended. Having been ushered to the seat, she was entitled to assume that means of access to and egress from it were not accompanied by any danger, and she was justified in assuming that she might safely walk to the aisle even though she could not see the floor where she was walking. As said in Branch v. Klatt, supra, 165 Mich. 666, 670, 131 N. W. 107, 109:

''One would have a right to presume that the defendant had discharged his duty of having the premises in a reasonably safe condition, as to lights and construction; and the ordinary person would naturally suppose that it would be safe to pass along a passageway provided for his exit, with reasonable assurance of its being in safe condition. The very fact of the premises being maintained in a darkened condition might give him added assurance of its being reasonably safe.''

In Bloomer v. Snellenburg, 221 Pa. 25, 27, 69 A. 1124, 21 L. R. A., N. S., 464, in speaking of a customer invited into a store, the court said:

"It is not reasonable to expect that the same degree of attention shall be bestowed upon the placing of the feet, under such circumstances, as would properly be required outside upon the public highway."

This excerpt is quoted with approval in Nelson v. F. W. Woolworth & Co., 211 Iowa 592, 605, 231 N. W. 665, 670.

Of such a traveler upon the public highways, we have said:

"A traveler is not bound to apprehend danger nor to be vigilant in discovering obstructions but may walk or drive in daytime or nighttime, relying upon the assumption that the municipality has performed its duty in maintaining the streets in a reasonably safe condition for public travel and has not by its neglect exposed him to danger." Frohs v. Dubuque, 169 Iowa 431, 436, 150 N. W. 62, 64.

See, also, Spiker v. City of Ottumwa, 193 Iowa 844, 849, 186 N. W. 465. In Riggs v. Pan-American Wall Paper & Paint Co., 225 Iowa 1051, 1057, 283 N. W. 250, 252, the court said:

"* * * it is well settled that persons rightfully in a building may go about for the purpose for which they have been invited to enter, assuming that reasonable precautions have been taken for their safety, and are not bound to especially look for dangers the existence of which would imply negligence on the part of the owner."

For similar holding, see Drummy v. Minneapolis & St. L. R. Co., 153 Iowa 479, 482, 133 N. W. 655; McNaughton v. Illinois Cent. Ry. Co., 136 Iowa 177, 181, 113 N. W. 844; Gardner v. Waterloo Cream Separator Co., 134 Iowa 6, 10, 111 N. W. 316; Nelson v. F. W. Woolworth & Co., supra, 211 Iowa 592, 604, 605, 231 N. W. 665. We have also held that, "There is no rule by which failure to look out for or discover danger, when there is no reason to apprehend any, can rightfully be held contributory negligence, as a matter of law." Spiker v. City of Ottumwa, supra, 193 Iowa 844, 849, 186 N. W. 465, 467.

See, also, Downing v. Merchants Nat. Bank, 192 Iowa 1250, 1254, 1255, 184 N. W. 722, 20 A. L. R. 1138. In Gibbons v. Balaban & Katz Corp., 242 Ill. App. 524, one leaving a darkened theater unattended while the picture was being exhibited was held not guilty of contributory negligence as a matter of law. It may be said of appellant as was said of the plaintiff in Geninazza v. Leonori Auction & Storage Co., Mo. Supp., 252 S. W. 417, 420:

"In the light of the facts, plaintiff was not required, as a matter of law, to stop and cautiously feel her way; that measure of care would be extraordinary. Her duty was to exercise ordinary care and that was a question of fact for the jury."

The issue of contributory negligence was also for the jury in the case before us.

II. Appellant's first assignment of error complains of the court's failure to instruct the jury on the issue of appellee's failure to give any notice or warning to her of the step. No verbal warning was given of its existence. Such notice or warning would not have been necessary if the appellant knew the step was there or it was so obvious that any person of ordinary intelligence should have seen it. It could have been made obvious by adequate lighting. Appellant alleged that the lighting was not sufficient, and supported the allegation by substantial testimony. In the absence of lighting sufficient to make the step readily visible, the jury could find that the exercise of reasonable care required appellee to warn appellant by oral or other means. There is no evidence that this was done. This failure was a pleaded issue. It was for the jury to pass upon the issue and it should have been instructed as to the law upon it, whether an instruction was requested or not. Here such a requested instruction was submitted to the court. We have recently discussed the duty of the court to instruct, in such a situation as this, where the issues require it, whether specific request therefor be made or not. Without further citation of authorities, we call attention to Harrington v. Fortman, 233 Iowa 92, 8 N. W. 2d 713, 717 et seq., which also applies to Division III herein.

It is a well-recognized general rule that an owner of land or a building owes a duty to use reasonable care to give warn-

ing of any dangers that are hidden, or not reasonably observable in the exercise of ordinary care, to any invitee upon the premises. Gardner v. Waterloo Cream Separator Co., supra, 134 Iowa 6, 8–10, 111 N. W. 316; Walker v. Roosevelt Hotel Co., 214 Iowa 1150, 1155, 241 N. W. 484; Drummy v. Minneapolis & St. L. R. Co., supra, 153 Iowa 479, 482, 133 N. W. 655; Mann v. Des Moines Ry. Co., 232 Iowa 1049, 7 N. W. 2d 45, 54; Bowden v. S. H. Kress & Co., 198 N. C. 559, 152 S. E. 625, 626; Eastern Shore of Virginia Agr. Assn. v. LeCato, 151 Va. 614, 144 S. E. 713, 714; Calvert v. Springfield Elec. L. & P. Co., 231 Ill. 290, 83 N. E. 184, 185, 14 L. R. A., N. S., 782, 12 Ann. Cas. 423; 3 Cooley on Torts, 4th Ed., section 440; II Restatement of the Law, Torts, 932, 938, sections 342, 343; 20 R. C. L. 55, section 51; Kelley v. Goldberg, 288 Mass. 79, 192 N. E. 513, 514; Cole v. North Danville Coop. Creamery Assn., 103 Vt. 32, 151 A. 568, 570; Breit v. Haas, 126 Fla. 835, 172 So. 697; Hudson v. Kansas City Baseball Club, 349 Mo. 1215, 164 S. W. 2d 318, 142 A. L. R. 858; 62 C. J., Theaters & Shows, 870, section 57d; Correira v. Atlantic Amusement Co., 302 Mass. 81, 18 N. E. 2d 435; Coffer v. Bradshaw, 46 Ga. App. 143, 167 S. E. 119; Lemoine v. Springfield Hockey Assn., 307 Mass. 102, 29 N. E. 2d 716, 718; Easler v. Downie Amusement Co., 125 Maine 334, 133 A. 905, 53 A. L. R. 847, 850.

Moving-picture exhibitors are held to stricter account in the performance of this rule, because of their darkened theaters. See the following cases cited above: Bennetts v. Silver Bow Amusement Co.; Trame v. Orpheum Theatre Co.; Emery v. Midwest Amusement & Realty Co.; McCartan v. Park Butte Theater Co.; Central Amusement Co. v. Van Nostran; Dondero v. Tenant Motion Picture Co.; Haugh v. Harris Bros. Amusement Co. See, also, Gray v. Fox West Coast Service Corp., 93 Mont. 397, 18 P. 2d 797; Bass v. Southern Enterprises, Inc., supra.

Failure to instruct the jury on this issue was prejudicial error.

III. Appellant's second assignment of error asks reversal because of the refusal of the court to instruct, as requested, that the appellant was entitled to assume the appellee

had exercised reasonable care to make its theater safe, and that it would have warned her of any obstruction underfoot, or other dangers. In the discussion of contributory negligence we have cited and quoted decisions of this court, and other authorities, that the appellant was entitled to rely on this assumption. Other decisions, cited above, involving motion-picture exhibitors, so holding are: Olsen v. John Hamrick's Tacoma Theatres; Texas Consolidated Theatres v. Pittman; Griffen v. Cascade Theatres Corp.; Tovey v. G. E. Lothrop Theatres Co.; Majestic Theater Co. v. Lutz; Branch v. Klatt; Magruder v. Columbia Amusement Co.; Standard Theaters Corp. v. Hughes; Purdy v. Loew's St. Louis Realty & Amusement Corp.; Oakley v. Richards; Olsen v. Edgerly; Johnson v. Mathews-Moran Amusement Co.; Andre v. Mertens. See, also, Durning v. Hyman, 286 Pa. 376, 133 A. 568, 570, 53 A. L. R. 851; Sharpless v. Pantages, 178 Cal. 122, 172 P. 384.

The failure to give this instruction was particularly prejudicial on the issue of contributory negligence, upon which the jury may have based its verdict against the appellant. The assignment is a meritorious one.

IV. It appeared in the examination of appellee's theater architect that under his supervision the appellee's theater was remodeled somewhat, after the appellant's injury, by removing the step which caused the appellant's fall and other similar steps in the theater, and putting in their place ramps or gradually sloped inclines the lower ends of which were level and flush with the aisle floors. This expert witness had testified that the use of the steps was *necessary* and approved theater construction. The witness was cross-examined at length respecting this substitution and the reasons therefor, and the results effected. He admitted that both methods of construction were used. He testified that the ramp construction "is one practical way to do it. I don't think it is more dangerous to do it that way. Q. Now, as a matter of fact, isn't it less dangerous? A. I don't believe I can give you a yes or no on that, because there are some elements that enter into it. *We considered the danger of coming from this seat down to that change, lower level, stepping into that aisle, and whether there wasn't a possibility of that.* I am giving you the practical

considerations that came into this argument. Anybody might form their opinion on it. * * * We debated over the safe method of construction. We don't know yet which way is the best. We did do it. * * * The only method we have is to hark back to experience and judgment and consultation with our clients."

This examination is an admission that the elevation of seats making it necessary to reach them by a "step construction" is· dangerous. One of the factors entering into such construction of elevated seats, according to the witness is "how many seats are required. Maybe how much money they can afford to spend." Approximately nineteen twentieths of the seats in the ground floor of the auditorium were elevated so that all might see, but it was by a gradual incline of the floor from the stage to the rear of the auditorium, and without any steps.

The matter of the discontinuance of the steps and the substitution of ramps had a very important relation to and bearing upon the claim of appellee, and the testimony of the expert that the step construction was necessary and was approved construction. The jury was entitled to have the full benefit of the testimony relative to the remodeling, and all reasonable inferences deducible therefrom, with respect to this claim of the appellee and this testimony of the expert. Yet the court instructed the jury as follows:

"No. 9. You are further instructed that the evidence in this case shows that since the accident in question the Des Moines Theatre has been remodeled and the condition of the floor is not the same now as it was at the time of the accident in question, and in this connection you are instructed that if in the process of remodeling the theatre the condition of the floor has been changed, such change cannot be received and considered as evidence of an admission of a previous defect in the construction, or as evidence tending to establish prior negligence of the defendant. Negligence of the defendant, if any, must be established by the plaintiff as heretofore instructed on evidence showing the condition of the floor and its construction and. maintenance at the time of the happening of the accident in this case, *and the fact that the building has been remodeled*

*and changes made in the floor should not be considered by you in arriving at your verdict in this case."* (Italics ours.)

At .the same time the court told the jury in Instruction No. 8 as follows:

"In determining whether the defendant did .use reasonable and ordinary care you may consider the evidence offered showing approved plan of construction, and construction of theatres in accordance with the general use, consistent with the- practical operation of the theatre."

The italicized portion of Instruction No. 9 is clearly erroneous and prejudicial. The testimony respecting the remodeling, both direct and cross-examination, was all in the record and went to the jury. It was competent, relevant, and material. The weight and probative value of this testimony and of all reasonable inferences therefrom were for the jury to consider, and the court invaded the province of the jury in instructing them to give no consideration to the testimony.

▮▮▮ We are not questioning the rule that generally subsequent repairs or changes in the place causing the injury cannot be shown to prove the alleged negligence.

▮▮▮ Both Instruction No. 9 and the excerpt from Instruction No. 8 stressed testimony favorable to the appellee but omitted to give equal, or any, prominence to pertinent testimony of the appellant bearing on the same matters and weakening the force of appellee's testimony. We condemned such practice emphatically in Whitman v. Chicago, Great Western Ry. Co., 171 Iowa 277, 284, 285, 153 N. W. 1023, 1026, in the following language:

"While we deprecate the recital in instructions of facts and circumstances which have probative force upon the issues tendered, because they tend to give undue prominence to the facts recited, we are clearly of the opinion that, if the court undertakes to recite the facts disclosed by the evidence which have probative force upon the issues tendered, it must recite all the facts favorable to the party as well as those which militate against his claim. We most emphatically dissent from the practice of reciting facts which militate against one party, without a recitation of the facts favorable to his contention, and

reciting facts which are favorable to the other party's contention, without a recitation of facts disclosed by the evidence which militate against his contention, and we think that is the condition that confronts us here.''

The error assigned is reversible error.

We find no merit in appellee's contention that appellant's exceptions to instructions do not comply with the statute, or that the assignments of error violate our Rule 30.

For all of the reasons given the judgment is reversed and the cause is remanded for new trial.—Reversed and remanded.

MULRONEY, C. J., and OLIVER, GARFIELD, WENNERSTRUM, and MANTZ, JJ., concur.

SMITH and HALE, JJ., dissent.

MILLER, J., takes no part.

SMITH, J. (dissenting)—There is no substantial dispute in the record as to the material facts bearing on the question of contributory negligence. I am compelled to dissent from the conclusion of the majority on that question. I think there should have been a directed verdict for defendant and that all discussion of the alleged errors urged by appellant is immaterial and unnecessary.

Plaintiff herself testifies:

''When we went into the Des Moines Theater I was ushered to my seat by an usher there. He had a flashlight. It cast a light on the floor so you could see to get to the seat. * * * We didn't get in at the beginning of the picture. * * *

''Within the place where the audience watches the show the interior was quite dark, just real dim lights. * * *

''Well I got up and started to walk out, and I reached back for Darlene's hand, and of course, looked back at the floor, tried to look at it, but it was so dark you couldn't see the floor, so I just walked out, or started to walk out. I hadn't stepped any more than two steps, I think, until I fell just as soon as I come to the end of the seat and stepped down here, lost my balance and went headlong into the seats on the other side of the aisle. * * *

"At the time I got up and walked out I did not know there was any set-off where the floor goes into the aisle. When the usher ushered me into my seat he did not tell me there was a step-off there. * * * I did not notice that condition there when I went into the seat. * * * Q. I ask you to state whether you were looking or not as you got up to leave. A. I tried to see, but it was so dark that you couldn't see the floor there where I came out."

There is more of her testimony but the foregoing is the substance of her direct examination bearing on this question.

On cross-examination she says:

"I came into the seat [where] I was sitting over the same path I went away on. I suppose I stepped up this step when I went into the seat but I didn't notice it."

Plaintiff was sixty-four years old at the time of the accident and weighed 223½ pounds.

Under this record it seems to me plaintiff must be held guilty of contributory negligence as a matter of law. It is true she was an invitee, but there was in the situation a mutuality of interest and of duty. She was in the theater for her own and not for defendant's purposes. She had a right to assume defendant would not be negligent but there was a reciprocal obligation on her part to exercise care for her own safety. See 45 C. J. 956 et seq.; Hammer v. Liberty Baking Co., 220 Iowa 229, 233 et seq., 260 N. W. 720.

When plaintiff came in, defendant lighted her past the danger spot. Her granddaughter went up the step ahead of her. Plaintiff knew the darkened condition of the theater. She knew defendant's usher used a flashlight in escorting her to her seat. "It cast a light on the floor so you could see to get to the seat." The darkened condition of the theater was necessary to the very purpose of plaintiff's presence there. It was a warning to her of danger. Hammer v. Liberty Baking Co., supra; Central Publishing House v. Flury, 25 Ohio App. 214, 157 N. E. 794, 798 [aff. 118 Ohio St. 154, 160 N. E. 679]; Kurre v. Graham Ship by Truck Co., 136 Kan. 365, 15 P. 2d 463, 466. It is incredible that she could have stepped up out of the aisle to her seat without knowing of the difference in floor level. If she

paid no attention to what she was doing when she went in, she was indeed negligent. She knew she would have to retrace her steps to get out. If there was danger she knew of it then, or in the exercise of due care should have known of it. A person is conclusively presumed to know what he would have known if he had made ordinary use of his senses. Seabridge v. Poli, 98 Conn. 297, 119 A. 214; De Honey v. Harding, 8 Cir., N. D., 300 F. 696. See Buchholtz v. Incorporated Town of Radcliffe, 129 Iowa 27, 105 N. W. 336.

Plaintiff sat throughout the performance only one seat removed from the aisle, which was at the lower level. A part of that time her daughter sat in the seat at her right and next to the aisle, and for a time that seat was vacant. Some five or ten minutes before the accident the daughter left her seat beside plaintiff, and in stepping down into the aisle staggered on this step but happened to "catch" herself. This happened right beside plaintiff.

When plaintiff started to leave she knew the theater was still dark and that there was no usher with a flashlight to light her out as she had been lighted in. She could not, as a reasonably prudent person, close all her senses to the situation into which she had voluntarily (even though by defendant's invitation) placed herself. She was bound to exercise due care, even though she was an invitee. Kurre v. Graham Ship by Truck Co., supra. When she "tried to look" at the floor, as she testifies, and found that "it was so dark you couldn't see the floor," but nevertheless "just walked out or started to walk out," she did not exercise the due care required by law.

Either she failed to use her intelligence when she entered or she ignored or forgot when she went out what she learned as she came in. In either case she must be held negligent, unless her attention, at the moment of departure, was diverted by some unexpected fact or circumstance of which there is no showing in the record. Sanderson v. Chicago, M. & St. P. Ry. Co., 167 Iowa 90, 149 N. W. 188.

Forgetfulness is not such a diverting circumstance: Davis v. City of Dubuque, 209 Iowa 1324, 1328, 1329, 230 N. W. 421. In fact, forgetfulness of danger is itself usually negligence.

Miller v. White Bronze Monument Co., 141 Iowa 701, 711, 118 N. W. 518, 18 Ann. Cas. 957; 38 Am. Jur. 863, section 187; Reynolds v. Los Angeles G. & E. Co., 162 Cal. 327, 122 P. 962, 39 L. R. A., N. S., 896, Ann. Cas. 1913D, 34; Rice v. Goodspeed R. E. Co., 254 Mich. 49, 235 N. W. 814.

We have said: "* * * generally speaking, the very essence of negligence is inadvertence." Cahill v. Illinois C. R. Co., 148 Iowa 241, 248, 125 N. W. 331, 333, 28 L. R. A., N. S., 1121.

If defendant could, under the record, be found guilty of negligence which was the proximate cause of the accident (a proposition I do not pass on), plaintiff was clearly guilty of contributory negligence. See St. Louis, I. M. & S. Ry. Co. v. Forbes, 63 Ark. 427, 39 S. W. 63; Ware v. Evangelical Baptist B. & M. Soc., 181 Mass. 285, 63 N. E. 885; Watkins v. Piggly Wiggly Bird Co., 8 Cir., Mo., 31 F. 2d 889.

The burden was on plaintiff to show freedom from contributory negligence. If her conduct contributed in any manner and to any degree to her injury she is not entitled to recover. Riess v. Long, 229 Iowa 378, 294 N. W. 592. The same condition of darkness that imposed an extra degree of care upon defendant placed a similar burden upon plaintiff.

Citations from other jurisdictions, and even our own decisions, are inconclusive as precedents. Each case must stand on its own facts. It seems clear to me that a verdict for plaintiff under this record would have had to be set aside. The cases cited in the majority opinion do not fit the facts revealed by this record.

I express no opinion as to any of the other questions discussed by the majority opinion. For the reasons herein stated, I think the case should be affirmed.

HALE, J., joins in this dissent.