RACHEL WOOD, Appellant, v. TRI-STATES THEATER
CORPORATION, Appellee.

No. 46875.

JULY 29, 1946.

L. D. Dennis and D. M. Elderkin, both of Cedar Rapids, for appellant.

Jordan & Jordan and H. E. Spangler, all of Cedar Rapids, for appellee.

GARFIELD, C. J.—■ The question presented is whether the issue of defendant's negligence was for the jury to decide. If from the evidence reasonable minds might reach different conclusions upon this issue it was properly for the jury. Lawson v. Fordyce, 234 Iowa 632, 636, 12 N. W. 2d 301, 303, and cases cited.

■ We must consider the evidence in the light most favorable to plaintiff and give her the benefit of all permissible inferences.

It is conceded plaintiff was an invitee when, in the act of leaving defendant's theater in Cedar Rapids, she fell in the lobby. The single charge of negligence is that defendant was negligent in installing and maintaining in its lobby a floor covering so constructed that it would catch the shoe of a person rightfully passing over it and suddenly trip and throw such person, with great force and violence, to the floor. At the conclusion of plaintiff's evidence and again at the close of all the evidence defendant moved for a directed verdict principally on the ground there was insufficient evidence of defendant's negligence. These motions were overruled. The jury returned a verdict for plaintiff. Defendant then moved for judgment notwithstanding the verdict, under Rule 243(b), Rules of Civil Procedure, which provides:

"If the movant was entitled to have a verdict directed for him at the close of all the evidence, and moved therefor, and the jury did not return such verdict, the court may then either grant a new trial or enter judgment as though it had directed a verdict for the movant."

The trial court sustained this last motion because it felt the evidence of defendant's negligence was insufficient. We think the court was right in submitting to the jury the issue of defendant's negligence and erred in entering judgment for defendant notwithstanding the verdict.

■ The proprietor of a theater is bound to exercise ordi-

nary care for the safety and protection of its patrons—to make the premises as little dangerous as reasonable care can make them. 52 Am. Jur. 291, section 47. While a proprietor of a place of public entertainment "is held to a stricter account for injuries to patrons than the owner of private premises generally," he is not an insurer of the safety of patrons, but owes to them only what, under the circumstances, is ordinary and reasonable care. Clark v. Monroe County Fair Assn., 203 Iowa 1107, 1112, 212 N. W. 163, and cases cited. See, also, Tilma v. Clay County Fair Assn., 232 Iowa 984, 986, 987, 6 N. W. 2d 843, 845; 62 C. J. 866, section 49; annotation 98 A. L. R. 557, 558, and earlier annotations therein mentioned. The rule is frequently stated to be that the occupant owes to invitees the duty to exercise ordinary care to keep his premises in reasonably safe condition, so such persons shall not be unnecessarily or unreasonably exposed to danger. 45 C. J. 826, section 237; LaSell v. Tri-States Theatre Corp., 233 Iowa 929, 946, 11 N. W. 2d 36, 45, and authorities cited.

There is substantial evidence of the following: Plaintiff is a widow who when injured was sixty-three years old, weighed about one hundred fifty pounds, and worked as a janitress. About midafternoon on February 8, 1944, she went to defendant's Paramount Theater, purchased a ticket, and registered for bank night to be held that evening. On at least some bank nights money, sometimes several hundred dollars or more, is awarded by lot to someone who has purchased a ticket and registered for that purpose. Because of her work plaintiff was unable to attend the show that day and after registering for the elusive bank night prize was given the stub of her ticket which entitled her to attend the movie on a later day. In leaving the theater she caught the toe of her right foot on the side edge of a large thick mat which for many years had covered part of the lobby floor. She fell forward and sustained a severe fracture of the left leg and other injuries. Down to the time of trial more than a year later, she had been unable to walk.

We set out here a diagram of the theater lobby.

Four double doors leading into the lobby from the sidewalk are at the top—north—of the diagram. The lobby is about twenty-five feet wide and thirty-three feet deep. Approximately in the center is the eight-sided ticket-seller's booth or box office. The ticket taker is, stationed inside the inner door at the lower left of the diagram. The customary way of entering the theater after the purchase of a ticket is for the patron to keep to his right (the left side of the diagram). After seeing the show, patrons usually keep to their right (the right side of the diagram) in leaving.

The four rectangles between the ticket booth and the outer doors represent floor mats. Each mat is about six feet two inches wide and ten feet four inches long. These four mats completely cover the space north of the ticket booth. The two rectangles on each side of the lobby (four in all) between the four mats first mentioned and the inner doors represent other mats, each of which is about five feet seven inches wide and eight feet three inches long. The two mats shown on the left of the diagram are generally used by incoming patrons, while the mats A and B are usually used by those who have seen the show and are leaving the theater. Plaintiff fell on the mat A at about the X. There is a smooth bare floor in the space between the box office and the inner doors, a distance of about thirteen and one-half feet, and between the mats A and B and the two mats opposite A and B on the left of the diagram.

After plaintiff came into the lobby and purchased her ticket she went around the box office to her right and entered the inner door at the lower left of the diagram. The ticket taker took her ticket on which she had written her name, address, and phone number for the bank-night drawing. Plaintiff also deposited a card, with her name and address on it, in a box further inside the theater. She then returned to the ticket taker, who handed her the stub of a ticket which entitled her to attend a later show.

Plaintiff says:

"I had to come out the left-hand door to pick up my ticket. The same door I went in and that others would enter as they would go into the theater. After I got my ticket and came out the [inner] door, there were quite a lot of people coming around the right-hand side of the box office who appeared to be going into the theater. After I came out the [inner] door I tried to leave the theater to my right."

After plaintiff emerged from the ticket-taker's door at the lower left of the diagram she walked diagonally to her right (northeast) in order to avoid "quite a lot of people" who were entering the theater (a new show was about to start) and because that was the usual and ordinary way pa-

trons left the theater who came to register for bank night without attending the show. Plaintiff testifies:

"I always see lots of them do that, and I had always went that way when I did not go in the show. I was following the usual and general way of going out of the theater after I received my ticket from the ticket taker."

Regarding her fall, plaintiff says:

"The edge of the mat just caught the right toe of my shoe and just held that foot there. * * * · My right foot was held tight by the toe, and then something just went right up over this left ankle and just clamped my feet together just like that. Q. Was there anything you could see that went over your ankle except the mat? A. Nothing that I could see. * * * I fell because my feet seemed to be held tightly. I had no way to catch myself. That mat as it was raised around my left ankle held awfully tight until I fell, and of course it then released. I fell on my right side across the mat away from the side I caught my foot in."

The mat on which plaintiff fell has been certified to us. This is a photograph, greatly reduced in size and not very clear, of the mat:

As stated, the mat is about five feet seven inches by eight feet three inches by five-eighths inch thick. From the floor to the top of the mat, along the side edges, measures about three-fourths inch. The mat weighs one hundred thirty-six pounds. It is made of numerous links or chunks of leather, each about one and seven-eighths inches long by seven-eighths

inch wide. Between each two links is an opening about three-fourths inch to seven-eighths inch square. The links are held together by steel wires which run crosswise and form a loop around each link that is on the outside edges. The side edges of the mat do not form straight lines horizontally but are notched. These notches are formed by the outside links (each about one and seven-eighths inches long), around which is the wire loop above mentioned, and an equal number of openings between the links. Each side of the openings is about three-fourths inch to seven-eighths inch. The side edges of the outside links of the mat rise vertically from the floor and are flat except for the wire loops which are about half way from the bottom to the top of the mat.

On the north end of the four mats just inside the outer doors and the south end of the two mats just outside the inner doors are metal guards or risers, some two inches wide. These guards are shown on the diagram by the shaded marks on the six guarded ends. On the mat A, pictured above, the guard is shown by the light streak at the left—south—end. Each guard is nearly five-eighths inch thick on the inside where it meets the mat proper. The outside edge of each guard is "a very small fraction of an inch" thick—where the end of each guard meets the floor it feels "just about flat and almost even on the floor." It is obvious these guards rise gradually from the floor to the top of the mats so it is improbable a person would trip or fall over the guarded ends.

As shown by the above diagram, for the most part the unguarded *ends* of mats are flush with other mats. Also, as stated, the four outer mats completely cover the floor outside the box office. The space outside the mats A and B and the space outside the mats opposite A and B are used for advertising displays. Thus the only exposed side of any of the mats upon which people would ordinarily step is the inside of the mat A upon which plaintiff fell or the inside of the south end of the mat B.

A witness testifies he has had twenty years' experience in selling similar mats and is familiar with them; they are for the purpose of cleaning dirt from the feet of those who enter the building; they "are usually laid in such a manner

that the ends are protected so people will not stumble over them; these mats are either laid from wall to wall with a riser at the door so people don't stumble over them, or they are laid lengthwise where the traffic moves in one direction for that same purpose, and in that case usually a nosing is put there because the mat is anywhere from three-eighths inch to five-eighths inch thick. * * * we sell them so they will lie in the direction in which the traffic flows, and usually (when) we sell them with a piece of copper or aluminum nosing on them so there is no stepping up to clear the mat. We also sell the same type of mats that are entirely enclosed, where it is impossible to stumble over them.

"Q. I will ask you if you know, if mats such as A and B are usually and ordinarily sold where cross travel over the rugs take place? .A. They are usually sold where travel is lengthwise of the mat."

This witness also says the primary purpose of the metal guards on such mats "is to make a gradual rise so there is no edge that would cause stumbling."

Although there is testimony that in two other buildings in Cedar Rapids mats of similar construction were in use in a manner somewhat like that in which defendant's mats were used, for the most part the above testimony of the salesman is undisputed. This same witness testifies he sold the mats in one of the two buildings to which we have just referred and supplied mats to cover the whole floor so the sides of the mats in that building were not exposed.

The shoes plaintiff wore when she fell have been exhibited to us. Plaintiff calls them walking shoes. They are sensible oxfords with comparatively low heels. The soles are about one-eighth inch thick. The upper part of the toe of the right shoe was partly torn from the sole when it caught in the edge of the mat and plaintiff fell.

We are not justified in holding that all reasonable minds must conclude from the evidence we have summarized that defendant was not negligent in the respect claimed by plaintiff. Under the particular circumstances shown, it may

fairly be concluded that plaintiff was unnecessarily, or unreasonably exposed to danger. Among such circumstances are: the thickness of the mat; the side of the mat was not guarded but rose abruptly—not gradually—from the floor; the edge of the mat was not straight horizontally but was notched so it more readily caught plaintiff's foot and tripped her; the location of the mat so plaintiff in leaving the theater in the usual manner of similar patrons came in contact with the abrupt edge of this mat.

The salesman's testimony to which we have referred is properly to be considered. Subject to certain exceptions not applicable here, evidence of what is usual and customary is generally admissible on the question of negligence, although it is not a conclusive test. Webber v. Larimer Hdwe. Co., 234 Iowa 1381, 1386, 15 N. W. 2d 286, 289, and authorities there cited; Tite v. Omaha Coliseum Corp., 144 Neb. 22, 12 N. W. 2d 90, 149 A. L. R. 1164, and authorities cited.

If the floor of such a theater lobby contained an abrupt rise of five-eighths to three-fourths inch or a vertical edge of linoleum or wood five-eighths inch thick, over which patrons customarily walked, it could scarcely be argued that a jury could not find such condition was not reasonably safe. Under the circumstances here, the abrupt, notched edge of this thick mat presented a situation fully as dangerous as those we have supposed.

We may observe further, in view of the evidence that the purpose of the mats is to enable patrons to clean their feet upon entering the theater, the conclusion is warranted that the mats A and B, over which patrons left the theater, served no useful purpose and were entirely unnecessary.

Although not entirely analogous on their facts, these are some of the decisions that may be cited in support of our conclusion—at least, in most of them the case for plaintiff is no stronger than plaintiff's case here: Griffin v. Cascade Theatres Corp., 10 Wash. 2d 574, 117 P. 2d 651; Majestic Theater Co. v. Lutz, 210 Ky. 92, 275 S. W. 16; Sharpless v. Pantages, 178 Cal. 122, 172 P. 384; Truschel v. Rex Amusement Co., 102 W. Va. 215, 136 S. E. 30; Mulloy v. Kay Jewelry Co., 289 Mass. 264, 194 N. E. 116; Dunlea v. R. D. A. Realty

Co., 301 Mass. 505, 17 N. E. 2d 707; Sears, Roebuck & Co. v. Peterson, 8 Cir., Minn., 76 F. 2d 243; Hellyer v. Sears, Roebuck & Co., 62 App. D. C. 318, 67 F. 2d 584.

In the ruling appealed from the trial court cited and defendant relies upon Nelson v. Smeltzer, 221 Iowa 972, 265 N. W. 924; Flatley v. Acme Garage, 196 Iowa 82, 194 N. W. 180; Erbe v. Maes, 226 Wis. 484, 277 N. W. 111; Heckel v. Standard Gateway Theater, 229 Wis. 80, 281 N. W. 640; Bohannon v. Leonard-F.-M. Stores Co., 197 N. C. 755, 150 S. E. 356 (a three-to-two decision); Kennedy v. Hotel Traymore, 159 N. Y. Supp. 872. We have no fault to find with these cases. Plaintiff's case here is considerably stronger than any of them.

No question concerning plaintiff's freedom from contributory negligence is before us upon this appeal.

With instructions to enter judgment on the jury's verdict, this cause is—Reversed and remanded.

All Justices concur.