AVON F. WENDLING, appellant, v. COMMUNITY GAS COMPANY, INC., appellee.

No. 50877.

(Reported in 120 N.W.2d 401)

March 12, 1963.

Swanson, Swanson & Boeye, of Red Oak, for appellant.

Jones, Cambridge & Carl, of Atlantic, for appellee.

SNELL, J.—Plaintiff, an invitee, seeks recovery for injuries sustained on defendant's premises.

Defendant was the owner and operator of a gasoline service station. Plaintiff had been a customer for many years. She patronized the defendant's station on an average of fifty times a year. It was her custom to remain in her car while it was being serviced, but she had been in the station building and was familiar with the premises.

On the morning of March 28, 1958, plaintiff drove her automobile upon the apron in front of the defendant's station for the purpose of buying gasoline. On this occasion she got out of her automobile and went into the station to write a check for her purchases and for some extra cash. In coming out of the station building she tripped on a hollow rubber signal hose extending from the building and across the driveways. This hose was a part of the regularly installed equipment used to ring a bell inside the station when a car drove up to the gasoline pumps. Plaintiff was injured and now seeks recovery. She alleges negligence on the part of the defendant in failing to exercise reasonable or ordinary care in the maintenance of its premises and that defendant had or should have had notice of a potentially dangerous condition and failed to remedy the same.

At the close of plaintiff's evidence the court sustained a motion of the defendant and directed a verdict for the defendant.

As the problem involves the sufficiency of the evidence to generate a jury question, a review of the pertinent parts of the testimony for the plaintiff is necessary. We will review the testimony in the same order as it was offered below.

Plaintiff called as her first witness Mr. Wm. L. Means, manager and president of defendant-company. He had been employed by the defendant-company for over twenty-eight years.

He was familiar with the type of hose used for the signaling device and had handled and installed them. The signal hose was fastened on the doorsill and at no other point, and except where fastened was movable. The hose came out of the doorway and out over a ledge or step in front of the door and then down and across the two driveways of the station. The ledge or step was about thirty inches wide and about six inches high.

The manager was not in the station at the time of plaintiff's accident, but was immediately called and arrived within a few minutes. Plaintiff was still sitting on the driveway where she had fallen. Together with another employee he helped plaintiff up and she steadied herself against the front door of her car. A doctor was called, who arrived promptly and plaintiff was taken to a hospital by ambulance.

Following plaintiff's departure the witness made observations of the front of the station, the step and hose trying to figure out what had happened. He saw nothing too drastic and nothing different about the hose than there had been for several years.

He testified that where the hose went over the edge of the step and down to the driveway there might have been a very minute gap "possibly a pencil-width or something like that, a quarter of an inch." Movement of the hose might change the position, but not up and down.

The hose, after leaving the fastening at the doorsill, was neither taut nor rigid. At one time there had been a bracket at the far edge of the ledge but there was none at the time of the accident.

The same, or a similar signaling device located in substantially the same place, had been used at the station for at least six years, and was the same type as was in common use in approximately 90% of the stations in the area.

The accident happened on a bright day and it was dry with no ice or snow.

In driving into the station from either direction there is a clear view of the driveway, the ledge and step.

The witness testified as to his experience in the installing of signaling devices and their use in other stations. In his opinion, based on the customary method of installation, the

hose should be fastened at no more than one point. One of several reasons was that if fastened tight there would be a greater tendency for a pedestrian to trip on it. "If it weren't fastened, the hose would give and you would just go right along."

The witness testified that during the period the signaling device had been installed in the station, to his knowledge no one had ever tripped or fallen over the hose.

The witness reiterated on redirect examination that if the hose was bracketed down and fixed it would be easier to trip over.

In what was apparently a momentary change in theory plaintiff attempted to inject the idea that the rear wheels of plaintiff's car were standing on the hose, thus causing it to be held in a fixed position, and causing the hose to act "like a snare." This theory, however, lacked evidentiary support.

The hose was completely movable from the sill of the doorway out to the island between the two driveways. Cars moving over the hose could move it if they suddenly applied their brakes. Employees could kick it and move it, and it was moved constantly when sweeping the driveway.

For the purpose of illustrating the testimony of the witnesses, a model or mock-up of the doorway, step and hose was used at the trial. The witness while on his knees measured and found that the hose at one point was 7/8ths of an inch above the ledge or step.

John Wright, a longtime employee of defendant, who serviced plaintiff's car, was called as a witness. He testified that it was plaintiff's custom to remain in her car and not enter the station building. Plaintiff usually charged her gasoline. On the morning in question plaintiff got out of her car and with the witness went into the station and wrote a check. He did not see plaintiff fall.

The witness testified that the hose was free as it laid across the ledge. At one time it had been bracketed down at the bottom, but he did not remember when, how or why the bracket was removed. He had made no observations during the time he worked at the station concerning any gap or rise of the

hose.. "Kids walking by or on bicycles could have pulled the hose or kicked it around."

He testified that the hose was in plain sight with nothing covering it. It ran out across the two drives and could be seen from either drive. The hose could be seen as you came out of the station door and had been there at least five years.

The witness was notified of the plaintiff's fall by a young boy. The plaintiff was in a sitting position about a foot off the ledge and about four feet from the station door. Her back was to the station.

Dr. Dallas York was called to the station to attend plaintiff and arrived promptly. He found plaintiff leaning on the door of her car next to the station door. He testified that plaintiff remarked that she tripped over the cord. Describing the cord or hose as he saw it, he said: "It was flipped up a little bit. Evidently she had kicked it over. When I observed it the hose was elevated above the step. There was approximately a one-inch gap between the top of the step and the bottom of the hose." The balance of the doctor's testimony related to the plaintiff's injuries.

Plaintiff testified that she and her husband had been customers of the defendant for a long period of time prior to the accident. On the morning in question she drove into the station about 8:15 a.m. The condition of the road and driveway was good. She was wearing high heels "like all women wear." She said, "I got out of my car on the side next to the pumps, walked around back of my car and into the station. I paid for my gas and gave a check for more than the purchase as I needed some cash to take to Omaha. * * * As I left the station and went out across the step I caught my heel in the loop of the hose that was loose and I fell. * * * I caught my heel and tripped and fell right in front of the step or ledge, sitting up. My hands were on the sidewalk. * * * When Mr. Means arrived he wanted to know what happened and I told him I tripped over the hose. The doctor was called. Mr. Means and Mr. Wright took me under the armpits, lifted me and walked me to the right-hand door of the car. This was just a few steps southwest of the station door. They had opened the car door.

I hung on the door in as straight a position as I could stand. The doctor arrived in a few minutes.

"While I waited for the doctor I looked at the hose over which I had tripped and observed the hose was looped up out at the edge of the ledge. The hose was bracketed on the east side of the door jamb.

"I entered the station by going to the rear of my car and more or less paralleled the hose. At no time was I further away from the hose than I was where I fell to be able to look at it. I was too close to it to see light under it until after I fell.

"I don't remember which heel I caught, but believe it was the left one. * * *

"As a normal procedure when I bought gas at the station, I would drive in and stay in my car while it was serviced. I had been in the station before this morning, but it had been years ago."

From her cross-examination we quote:

"I would average driving in the station once each week or ten days. Fifty times a year would be approximately correct and that had been continuous over all those years. * * * Things on the driveway were visible. I had seen the cord on several occasions and knew it was there to ring the bell. I remember the bell ring once that morning and I assume it was when my front wheels crossed the hose. * * *

"I followed Mr. Wright into the station and walked around the back of my car. The rear of the car was east of the hose. I had to cross the hose on the ledge going into the station, but I do not remember it particularly. I would say I didn't look at it. I knew it was there but I don't remember where I stepped over it entering the station. I knew the hose was there because of previous visits to the filling station * * *

"I did not see the hose as I left the station. I knew it was there. I didn't look at the signal hose as I came out the door. I didn't think it was necessary to look for things. I don't think I looked but I knew it was there, I was on the ledge or step when I caught my heel in the hose and fell. I think it was my left heel. I felt my heel as it caught in the hose and it

threw me. It was loose. I took no step after catching my heel. * * *

"I suppose I was walking fast. I was thinking of going to Omaha and picking up the other lady. * * * Had I been looking for it I could have seen the hose. If I had looked I would have seen it.

"It was a clear day. There was no debris, oil, snow, or ice there. I couldn't see anything different about this hose this day than the other days when I have been in there.

"I was to pick my friend up at 8:30. I had plenty of time. I always go in a hurry. * * *

"After the accident I was hanging on the door of the car and could see the hose on the ledge from there. It was loose and I could see light under it."

On redirect examination the plaintiff reiterated that she knew the hose was there.

The witness, after objection and in response to a question and demonstration by counsel, said that looking down a loop or gap (in the hose) could not be seen. After the answer was received a prior objection was sustained but there was no motion to strike the evidence from the record.

The balance of the testimony related solely to the plaintiff's injuries.

Photographs of the station taken three years and six months after the accident were not received in evidence—the evidence showing affirmatively that three and one-half years later the hose was not located in the same place as at the time of the accident.

Although somewhat repetitious, the foregoing is all of the testimony as to what happened.

■■ It should be kept in mind that according to the un-controverted evidence offered by the plaintiff the signal hose was in the same condition and in substantially the same place as it had been for several years. There had been no prior accidents and nothing to call to the attention of the defendant any dangerous condition. According to the plaintiff's own testimony she was as aware of the hose and its location as were the employees of the defendant. The signaling device was the same

as commonly used in other stations. That there was a possibility of someone tripping on the hose appears from the fact that the plaintiff did fall, but the mere possibility of injury does not in and of itself prove a dangerous condition. That the possibility of injury was remote is indicated by the testimony of a witness called by plaintiff that there had been no prior injuries caused by the installation.

The observation of the plaintiff that she could see light under the hose was not made while she was prostrate or sitting on the driveway. At that time her back was to the door. Her observation was made while she was standing by the door of her car.

If the hose at one point when it passed over the edge of the step was one inch above the surface as claimed by plaintiff, it was in the interest of safety. Plaintiff's witness, Mr. Means, definitely testified that if the hose was bracketed down in a fixed position it would be more hazardous. In other words, according to the testimony, a loose rubber hose not secured in place would be less dangerous than if fastened tight. We might also observe that a rubber hose on top and over the edge of the step would be more noticeable than one tightly fastened to the floor.

Just how far, if at all, the hose was above the level of the step at the time plaintiff fell is purely speculative. The only observations made were after the fall. The position of the hose after the fall, according to the testimony, reflected what plaintiff had done to it. Doctor York testified "It was flipped up a little bit. Evidently she had kicked it over."

I. Nowhere in the evidence is there anything indicating a hidden danger or a condition which the defendant knew or should have known was dangerous or of a condition with which the plaintiff was not fully aware.

Plaintiff in argument refers to the hose as a type of snare. If applicable to the facts the word "snare" is a very forceful word. When used by a plaintiff against a defendant it is appealing. It has definite connotations. It suggests culpability and resultant liability. The use of the word, however, does not make

a length of hose extending from a doorway and across a drive-way a snare.

The use of the word, together with other words of description, appears in 65 C. J. S., Negligence, section 50, quoted in Atherton v. Hoenig's Grocery, 249 Iowa 50, 54, 86 N.W.2d 252, 254, as follows:

"The duty to keep premises safe for invitees applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal, obvious, or ordinary risks attendant on the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers."

The same case quotes 38 Am. Jur., Negligence, section 97, pages 757 and 758, in these words:

"The liability of an owner or occupant to an invitee for negligence in failing to render the premises reasonably safe for the invitee, or in failing to warn him of dangers thereon, must be predicated upon a superior knowledge concerning the dangers of the premises to persons going thereon. * * *

"There is no liability for injuries from dangers that are obvious, reasonably apparent, or as well known to the person injured as they are to the owner or occupant."

II. Rule 344 (f) (10), R. C. P., provides:

"Generally questions of negligence, contributory negligence, and proximate cause are for the jury; it is only in exceptional cases that they may be decided as matters of law."

Rule 344 (f) (17), R. C. P., provides:

"Even when the facts are not in dispute or contradicted, if reasonable minds might draw different inferences from them, a jury question is engendered."

Rule 344 (f) (2), R. C. P., provides:

"In considering the propriety of a directed verdict for defendant the court gives plaintiff's evidence the most favorable construction it will reasonably bear."

These rules are condensations of well established principles of law, but they do not mean that a plaintiff in order to avoid

a directed verdict may rely on isolated inferences and ignore uncontroverted evidence.

The trend away from directed verdicts and toward submission of most questions to a jury was recognized in McGrean v. Bos Freight Lines, Inc., 240 Iowa 318, 322, 36 N.W.2d 374, 377, where it is said: "Recent decisions of this court have gone far in holding it proper to submit * * * close fact and inference cases to the jury." More recent cases, however, have indicated some deceleration in that trend and we have upheld directed verdicts where there was only inference or possibility of danger.

III. Actions by invitees seeking recovery for injuries are not unusual and the problems incident thereto have been before this court many times.

Chenoweth v. Flynn, 251 Iowa 11, 99 N.W.2d 310, resulted from an injury when plaintiff caught the heel of her shoe in a floor mat. The mat was of corded rubber construction installed on the floor approaching passenger elevators. The mat was to assist in removing ice and snow from the shoes of customers. The elevator operator, who saw the accident, stated that within three weeks prior thereto other people had caught their heels in the mats. She had reported the situation to defendants' maintenance man, but nothing was done about it. There was a condition that had been causing trouble and the fact had been made known to the defendants. There was a known hazard. It was held that the plaintiff had established a prima facie case sufficient to generate a jury question on the issue of primary evidence. In discussing the problem we said on page 15 of 251 Iowa, page 312 of 99 N.W.2d:

"The law applicable here appears to be well settled. The possessor of real estate is not an insurer of invitees who come upon his property, nor does the mere fact that an accident happened, of itself, create liability. His duty is that of reasonable care to keep the property in a reasonably safe condition for the contemplated use. Primus v. Bellevue Apartments, 241 Iowa 1055, 44 N.W.2d 347, 25 A. L. R.2d 565; Reuter v. Iowa Trust & Savings Bank, 244 Iowa 939, 57 N.W.2d 225. This duty applies only to defects or conditions which are in the nature of dangers, traps, snares, pitfalls, and the like, which

are not obvious or known to the invitee but which are or in the exercise of due care should be known to the possessor. It is predicated upon a superior knowledge. Atherton v. Hoenig's Grocery, 249 Iowa 50, 86 N.W.2d 252, and authorities therein cited."

In Wood v. Tri-States Theater Corporation, 237 Iowa 799, 23 N.W.2d 843, plaintiff was injured in a fall in a theater lobby. Her shoe was caught in a floor covering so constructed that it would catch the shoe of a person rightfully passing over it. The case carefully reviews the evidence and holds that there was sufficient evidence of negligence to create a jury question. The plaintiff had gone to the theater to purchase a ticket and register for a bank night drawing to be held that evening. In leaving the theater she caught the toe of her right foot on the side edge of a large thick mat which for many years had covered part of the lobby floor. The floor mat had safety edges or nosing, except on the side where the plaintiff tripped. The mats were ordinarily laid either from wall to wall with a riser at the door so people would not stumble over them, or they were laid lengthwise where the traffic moved in one direction for the same purpose. It was usual to put a nosing where the mat was from $\frac{3}{8}$ inch to $\frac{5}{8}$ inch thick. Where plaintiff tripped, however, the mat ran crosswise and contrary to the usual method of installation. The factual situation was not the same as in the case at bar. The installation was not only unusual, but unnecessary. On page 807 of the Iowa Reports, page 847 of 23 N.W.2d, is this comment:

"We may observe further, in view of the evidence that the purpose of the mats is to enable patrons to clean their feet upon entering the theater, the conclusion is warranted that the mats A and B, over which patrons left the theater, served no useful purpose and were entirely unnecessary."

While the facts in the Wood case differ from the case at bar the comments as to applicable law are pertinent. On page 801 of the Iowa Reports, page 844 of 23 N.W.2d, it is said:

"While a proprietor of a place of public entertainment 'is held to a stricter account for injuries to patrons than the owner of private premises generally,' he is not an insurer of the

safety of patrons, but owes to them only what, under the circumstances, is ordinary and reasonable care. Clark v. Monroe County Fair Assn., 203 Iowa 1107, 1112, 212 N.W. 163, and cases cited. See, also, Dahna v. Clay County Fair Assn., 232 Iowa 984, 986, 987, 6 N.W.2d 843, 845; 62 C. J. 866, section 49; annotation 98 A. L. R. 557, 558, and earlier annotations therein mentioned.

"The rule is frequently stated to be that the occupant owes to invitees the duty to exercise ordinary care to keep his premises in reasonably safe condition, so such persons shall not be unnecessarily or unreasonably exposed to danger. 45 C. J. 826, section 237; LaSell v. Tri-States Theatre Corp., 233 Iowa 929, 946, 11 N.W.2d 36, 45, and authorities cited."

On page 807 of the Iowa Reports it is said:

"Subject to certain exceptions not applicable here, evidence of what is usual and customary is generally admissible on the question of negligence, although it is not a conclusive test. Webber v. Larimer Hdwe. Co., 234 Iowa 1381, 1386, 15 N.W.2d 286, 289, and authorities there cited; Tite v. Omaha Coliseum Corp., 144 Neb. 22, 12 N.W.2d 90, 149 A. L. R. 1164, and authorities cited."

In the case at bar the installation was usual and customary.

In Atherton v. Hoenig's Grocery, supra, plaintiff-invitee had previously been in the store about twenty-five times. She had noticed the condition of the alleged defective threshold **upon previous occasions.** She had been going to the store for six months or a year prior to the time of the accident and was thoroughly aware of the condition. It was held that the burden was upon the defendant to show plaintiff's knowledge of the conditions. Ordinarily, it cannot be said as a matter of law that the one who carries the burden of proof has done so. **Where the plaintiff herself had testified to the fact which the** defendant was required to establish the knowledge of the condition was accepted as a verity. The same situation exists in the case at bar for the plaintiff repeatedly admitted that she knew of the hose, that it was stretched across the driveway and into the building and that she knew its purpose.

On page 55 of the Atherton opinion in 249 Iowa, page 255 of 86 N.W.2d, it is said:

"The possessor of real estate is not an insurer of the safety of those who come upon his premises by invitation, express or implied. Negligence is predicated upon an unperformed duty. The duty owed by the inviter is to those, and to those only, who do not know, or, in the exercise of reasonable care for their own safety, have no reasonable means of knowing, of defects or dangers. He may avoid liability in two ways: by making and keeping his lands safe or by warning of the dangers. Obviously, actual knowledge of defects and dangers is equivalent to, perhaps better than, a warning."

Kapphahn v. Martin Hotel Co., 230 Iowa 739, 298 N.W. 901, involved a case where a screen fell from a window on the fourth floor and injured a child on the sidewalk. The facts are not comparable to the case at bar, but the comments as to the foreseeability of danger are appropriate. On page 747 of the Iowa Reports, page 906 of 298 N.W., it is said:

"If a harmful consequence was not reasonably foreseeable, that is, was an improbable consequence, one which could not reasonably have been anticipated, there is no negligence.

" 'Foresight of harm furnishes the test of liability * * *.' * * * 'In order to establish the existence of negligence, it must of course appear that there was a duty to use care and an omission to perform that duty. Whether there was a duty upon defendant to use care depends upon the probability that some harm would result to plaintiff in the absence of care.' [Citations]

"This court has uniformly recognized the rule that reasonable foreseecability of harm is the fundamental basis of the law of negligence."

In the case before us danger was not foreseeable from a customary installation used for several years without incident.

In Corrigan v. Younker Brothers, Inc., 252 Iowa 1169, 110 N.W.2d 246, the plaintiff, an invitee, was injured when she fell over the steps leading to a platform in the defendant's tearoom. The plaintiff did not observe the platform as she approached it, because she was looking for friends with whom she had intended to eat lunch and play bridge. The authorities were carefully reviewed and the defendant's motion for a directed verdict was affirmed because of the conclusions that

1172

the steps over which plaintiff fell were plainly visible; her failure to see was due to her own failure to look; there was a distraction of her own making. There was no sufficient evidence of negligence of the defendant to require submission to the jury.

In Crouch v. Pauley, 254 Iowa 14, 116 N.W.2d 486, a customer in defendants' store fell over a roll of carpet located in an aisle three or four feet from the cashier's desk. The plaintiff went to the cashier's desk to pay for a purchase and in leaving caught her foot under the roll of carpet and fell. The authorities were again reviewed and again it was said that a customer cannot blindly and 'nonchalantly walk into an obvious hazard in a store and hold the storekeeper liable for negligence. The ruling of the trial court directing a verdict in favor of the defendants was affirmed.

In other cases where there has been evidence of a hidden danger or of a distraction created or permitted by the defendant questions for the jury have appeared and recoveries have been upheld.

In the case before us there is no evidence of a hidden danger nor of any distraction created by defendant. The installation was usual and customary. There was no history of prior accidents. There was nothing to alert defendant to the possibility of danger. Plaintiff was fully familiar with the premises and knew of the hose over which she tripped. There was no evidence sufficient to support a finding of negligence on the part of defendant.

IV. Plaintiff offered in evidence four photographs of the defendant's station taken three and one-half years after the accident. They were not received in evidence. The location of the signal hose three and one-half years after the accident was not the same as at the time of the accident. Plaintiff claims that these exhibits should have been admitted to support an inference that a hazardous condition existed and that the defendant knew of the condition and after the accident remedied the same.

It affirmatively appeared that the pictures did not depict the conditions as they existed at the time of the accident. There was no showing whatsoever as to how, when or why a change

was made. Without some showing other than a changed condition the photographs were too remote in time and were properly excluded.

The evidence in this case was insufficient to support a verdict for plaintiff. The directed verdict for defendant was proper.

The case is—Affirmed.

THOMPSON, LARSON, MOORE and STUART, JJ., concur.

GARFIELD, C. J., and PETERSON and THORNTON, JJ., dissent.

HAYS, J., not sitting.

GARFIELD, C. J. (dissenting)—I cannot concur in the foregoing opinion. I think the case was properly for the jury.

I. Appellee told us in oral argument the main precedent on which the trial court relied in directing the verdict is Atherton v. Hoenig's Grocery, 249 Iowa 50, 86 N.W.2d 252. It is defendant's and the majority's principal reliance here. The cited decision is correct under the facts there. The evidence in the present case bears no fair analogy to that in Mrs. Atherton's. For the majority to hold "The same situation exists in the case at bar" is to extend the cited decision out of all reasonable proportions.

The defect of which Mrs. Atherton complained was a worn threshold at the entrance to defendant's grocery. It would be difficult to look at the threshold without seeing its worn condition. But plaintiff's own testimony plainly showed she had full knowledge of the alleged defect for an extended period. She testified "she had previously been *in the store* approximately twenty-five times, and that she had noticed the condition of the alleged defective threshold upon previous occasions. * * * she had been going to the store for 'six months or a year or maybe several years' prior to the time of the accident.

" "* * * the step always looked treacherous and I was always careful. I would say that *it looked each and every time I would go in and out that it was a bad step. * * * It has always been badly worn. * * ** Well, *it always looked treacherous; * * **" "

(emphasis added) (page 53 of 249 Iowa, page 254 of 86 N.W.2d).

After quoting the above and other like testimony of plaintiff the Atherton opinion proceeds: "III. The plaintiff's knowledge of the prevailing condition *and of the defect which she claims caused her injury* cannot be doubted, in view of her * * * testimony. The burden was upon the defendants to show her knowledge of these things, and ordinarily it cannot be said as a matter of law that the one who carries the burden of proof has done so. But here we have the plaintiff herself testifying * * * to the very fact which the defendants were required to establish to bring themselves within the rule which we shall later discuss." (Emphasis added.)

An explanation of Atherton v. Hoenig's Grocery, supra, similar to what is just set out, appears in Corkery v. Greenberg, 253 Iowa 846, 850, 114 N.W.2d 327, 329, 330, after repeating, from Corrigan v. Younker Brothers, Inc., 252 Iowa 1169, 1173, 110 N.W.2d 246, 248, the familiar admonition, "The facts of each particular case of this kind are controlling on the question of negligence." The same statement appears in Stafford v. Gowing, 236 Iowa 171, 177, 18 N.W.2d 156, 159, and Holmes v. Gross, 250 Iowa 238, 242, 93 N.W.2d 714, 718.

The Holmes opinion also observes the obvious truth: "While we occasionally find similarities as precedents, the fact remains that in nearly all cases there are some differences which make consideration of the facts of each particular case a matter of importance."

The facts in Schleisman v. Dolezal, 254 Iowa 1114, 1119, 120 N.W.2d 398, 400, are fairly comparable to those in Mrs. Atherton's case and it supports the late decision. The Schleisman opinion says Mrs. Atherton "by her own evidence, as in the [Schleisman] case at bar, showed knowledge of the dangerous condition prior to injury."

There are no facts in the present case that make the Atherton decision or the two or three which follow it applicable here. There is no evidence this plaintiff was fully aware of the dangerous condition that caused her fall. True she knew an air hose lay across the two driveways leading motorists to the gasoline

pumps. But the particular condition which created the hazard and caused plaintiff serious injury was the position of the hose at the entrance to the station and the vertical space between it and the surface of the outer concrete ledge or step at the place where she fell. The majority's fundamental error is in assuming that because plaintiff saw the air hose on some of the many occasions when she remained in her car while it was being serviced she was fully aware of the alleged defect which caused her injury.

At the outset of its opinion the majority tells us, "Plaintiff had been in the station building and was familiar with the premises." If more than lip service were paid to the familiar rule "In considering the propriety of a directed verdict for defendant the court gives plaintiff's evidence the most favorable construction it will reasonably bear" the majority would have told us at the outset, as plaintiff testifies, "I had been in the station before this morning, but *it had been years ago*. I have never used the rest room facilities there. I would usually drive in, stay in the car, tell them to charge the merchandise and drive off." (Emphasis added.) Whether the air hose was installed "years ago", when plaintiff had been in the station before, does not appear. Defendant's manager says the hose had been in use, *although not in the same condition*, at least six years. The station attendant fixes this time at about five years.

The majority might also have told us defendant's manager testifies, "I can't recall her being in the station and I wouldn't swear she had been but I think she did some but I don't know." And the station attendant for about ten years prior to the trial says, "I don't remember her being in there [the station]."

On these prior trips to defendant's station when plaintiff drove in for service and remained in her car she had no occasion to observe the manner in which the air hose was draped over the ledge at the station entrance where she fell. The ordinary person, under like circumstances, would not do so. The situation is in no way analogous to the view a person would *and admittedly did* get of a threshold she had walked over for an extended time. Reasonable minds, viewing the case fairly, could readily find the dangerous condition here was neither obvious,

reasonably apparent to one in the exercise of ordinary care, nor as well known to plaintiff as to defendant's manager who says he checked the signal hose at least every day.

Corkery v. Greenberg, supra, 253 Iowa 846, 848, 114 N.W.2d 327, 328, says of a claim similar to that on which the trial court directed this verdict: "The first complaint requires a determination of whether the condition of the parking lot was obvious, reasonably apparent, and as well known to plaintiff in the exercise of reasonable care as it was to defendants as a matter of law."

The majority makes the sweeping pronouncement, "Nowhere in the evidence is there anything indicating a hidden danger or a condition which the defendant knew or should have known was dangerous or of a condition with which the plaintiff was not fully aware." This follows the assertion, "Just how far, if at all, the hose was above the level of the step at the time plaintiff fell is purely speculative. The only observations made were after the fall. The position of the hose after the fall, according to the testimony, reflected what plaintiff had done to it."

I completely disagree with the first of these quoted statements. The second overlooks important testimony and fails to view the evidence in the light most favorable to plaintiff.

This signal cord appears from the exhibits to have been about ⅝ inch thick—the precise thickness of the "large, thick mat" on the lobby floor of the theater involved in Wood v. Tri-States Theater Corporation, 237 Iowa 799, 23 N.W.2d 843. The majority attempts to distinguish the cited case on the untenable ground "The factual situation was not the same as in the case at bar. The installation [of the floor mat] was not only unusual, but unnecessary."

The floor mat in the entrance to the Flynn building, involved in Chenoweth v. Flynn, 251 Iowa 11, 14, 99 N.W.2d 310, 312, was also ⅝ inch thick and was 16 feet long. The majority tries to distinguish this precedent on the ground others had caught their heels in the mat but had not fallen and this had been reported to defendants. However, nothing of the kind appears in Mrs. Wood's case. Mrs. Chenoweth was an employee

in the building and had been using the mat daily since it was installed.

I think this plaintiff's case is fully as strong as Mrs. Wood's or Mrs. Chenoweth's, each of which unanimously reversed a judgment on directed verdict for defendants. The present case is like Mrs. Wood's in that placing this hose to enter the building on the side of the entrance door where the lock is and to extend across the front step or ledge at that point was entirely unnecessary. There are four windows in the front of the building. The hose could just as well have entered the building at the bottom of one of these windows or, preferably, through a small opening in the wall of the building at the floor level. Or the part of the hose which lay on the step or ledge could easily have been covered with "a nose" of inverted V-shape, made of linoleum or similar material, to minimize the danger of contact with it by invitees. It is common knowledge telephone and other cords strung along walking surfaces are customarily covered in such fashion. In short, this plaintiff was unnecessarily subjected to a hazard which could readily have been entirely avoided.

There is substantial evidence, which cannot fairly be discarded as purely speculative, that at the time plaintiff fell the bottom of the hose at the place where she caught her heel was from one-fourth inch to one inch above the surface of the outer part of the step or ledge on which it was supposed to lie.

Plaintiff testifies, "As I left the station and went out across the step I caught my heel in the loop of the hose that was loose and I fell." The height of plaintiff's heel had little if anything to do with her fall. A medium or low heel would as easily have caught in the hose. Doctor York officed across the street from defendant's station and arrived within five minutes. Plaintiff says and it is not disputed, "No one else came in or out of the station after I did." So no other motorist disturbed the position of the hose. Plaintiff also testifies, "While I waited for the doctor I looked at the hose over which I had tripped and observed it was looped up at the edge of the ledge."

Doctor York says, "When I observed it the hose was elevated above the step. There was approximately a one-inch gap

between the top of the step and the bottom of the hose." The doctor's statement, "Evidently she had kicked it over" is a pure conclusion that should not prevail over his statement of the fact. Defendant's manager, who would naturally minimize the space between the ledge and hose, fixes it at "a pencil-width or something like that, a quarter of an inch." This witness' opinion that the gap was very minute should not prevail over his factual statement.

As indicated, the majority tells us this gap of a quarter inch to an inch between the ledge and hose reflects what plaintiff did to the hose when she fell. There is substantial evidence to the contrary.

Defendant's manager testifies, "She was there possibly 15 minutes before she left by ambulance. Following Mrs. Wendling's departure I had occasion to make observations * * * concerning the step and hose leading out from the door. We were trying to figure out how it happened. * * * There was nothing different about the hose than there had been for several years. * * * *I did not observe anything different about the position of the hose after Mrs. Wendling had been gotten up than it had been previously.* * * * There was nothing unusual about the signal hose that morning after the accident." (Emphasis added.)

Defendant's manager contended that to fasten or bracket the hose at the far edge of the ledge or step tended to raise it at that edge. He said, "I couldn't tell if there was a bracket there on March 28, 1958 [date of the fall]." Asked if the hose "would be kind of like a snare" if there was a gap between it and the step and the hose were taut, the manager replied "That is right." A jury could find the hose was in such position when plaintiff fell.

It cannot be held as a matter of law that plaintiff in the exercise of ordinary care was bound to see the raised position of the hose at the place where she caught her heel. This was convincingly demonstrated by able counsel for defendant who produced at the trial a "mock-up" of the doorway, ledge and hose. He asked his manager to measure the gap between the hose and top of the ledge but admonished the witness, "You will have

to get down on your knees to look parallel." The witness' reply was, "Between ⅞ths and an inch."

Plaintiff testifies without dispute, "I entered the station by going to the rear of my car and more or less paralleled the hose. At no time was I further away from the hose than I was where I fell, to be able to look at it. I was too close to it to see light under it until after I fell. * * *

"Q. What direction were you in relative to the hose as it was on that step as you walked in, as you recall? A. I was above it.

"Q. Directly above it? A. That is right. * * *

"Q. In other words, looking down on that thing, should there have been even a two-inch loop, looking from this direction, what could you observe? A. Could not see."

The station attendant says "I did not make any observations during the time I worked at the station concerning the gap or rise of the hose. * * * We paid no attention to the hose except to repair it or move it to clean or sweep." Certainly plaintiff should not be compelled as a matter of law to make observations the station attendant did not make during his ten years of service. Nor did the exercise of ordinary care under the circumstances, as a matter of law, compel plaintiff to get down on her knees or stoop down to see if the hose was raised from the surface of the ledge. The extraordinary precaution that would have discovered this situation was not required of her.

That plaintiff admitted on cross-examination she could have seen the hose as she left the building, if she had looked for it, is relatively unimportant in view of the nature of the defect in it which was at best difficult for one standing near it to see.

Of course defendant is not an insurer of invitees. No one contends it is. But neither is plaintiff-invitee a self-insurer.

II. Before resting her case plaintiff offered in evidence four photographs of the front of defendant's station taken about three and one-half years after plaintiff fell. The photographs show the hose had been moved away from the entrance to the building and bracketed or fastened into the concrete drive below the ledge or step. Defendant objected to the offer on the ground the only material things are conditions on the date of

the accident and changes made since then would be immaterial, prejudicial and not proper evidence. When the court sustained the objection plaintiff made an offer of proof of facts shown by the pictures. A like objection to this offer was sustained. I think the photographs or the important facts shown by them were admissible under the record here.

Plaintiff evidently felt it was necessary to use defendant's manager as her witness. On cross-examination defendant brought out three matters not covered in the witness' direct examination. I quote from the record:

"The type of signalling device in use at our station is the common type used in approximately 90 per cent of the stations in this area." It is to be noted this is not confined to the type of signalling device in use at defendant's station prior to the time plaintiff fell.

"Q. Now, in the time you have had such a signal device at your station have you ever known of anyone tripping or falling over that hose?" Plaintiff's objection was overruled and the witness answered "Not to my knowledge." It is important to note this testimony is also not confined to the time before plaintiff fell. It includes the three and one-half years between the time of the fall and the trial.

"I don't believe in the customary method of installation they [signal hoses] would be fastened at more than one point. There would be several reasons for this, one of the most important would be that if anybody were coming along and with their toe, or something other, if it were fastened, would have a tendency to trip on it. If it weren't fastened, the hose would give and you would just go right along * * *."

The manager gave as another reason that it would be difficult to bracket or fasten the hose in concrete.

Defendant and the majority make much of the quoted testimony.

Since plaintiff called the manager as her witness she probably could not impeach him but she had a right to show the facts to be different from those testified to by him. This is not impeachment. Burch Mfg. Co. v. McKee, 231 Iowa 730, 733, 2 N.W.2d 98, 100; White v. Zell, 224 Iowa 359, 363, 276 N.W.

76; Royer v. Erb, 219 Iowa 705, 706, 707, 259 N.W. 584; State ex rel. Bar Assn. v. Jensen, 171 Neb. 1, 105 N.W.2d 459, 474, and citations; 98 C. J. S., Witnesses, section 630 (b), page 648; 58 Am. Jur., Witnesses, section 797, page 443.

The matters shown by these photographs are inconsistent with the quoted testimony, cast doubt upon it or are explanatory thereof. If defendant is permitted to show that no one except plaintiff fell over the hose certainly she should be allowed to show that during part of the time testified to the hose did not extend out from in front of the entrance door but had been moved. The photographs showing the hose fastened into the concrete—not merely at the sill—cast doubt on defendant's claim it is safer for invitees not to fasten the hose but to leave it loose.

LaSell v. Tri-States Theatre Corp., 233 Iowa 929, 960–962, 11 N.W.2d 36, 52, amply supports the view these photographs were admissible.

I would reverse.

PETERSON and THORNTON, JJ., join in this dissent.